Curtis Lee HEAD, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 780S209.

Supreme Court of Indiana.

Dec. 14, 1982.

Steven C. Smith, Anderson, for appellant.

Linley E. Pearson, Atty. Gen., Palmer K. Ward, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

The defendant, Curtis Lee Head, was convicted by a jury of attempted felony-murder, Ind.Code § 35–42–1–1 (Burns 1979 Repl.) and Ind.Code § 35–41–5–1 (Burns 1979 Repl.), as well as robbery, a class A felony. Ind.Code § 35–42–5–1 (Burns 1979 Repl.). He was sentenced to consecutive terms of fifty and thirty years for his respective crimes. In his direct appeal, he presents the following issues for our review:

1. Whether the trial court erred in overruling defendant's motion to dismiss the attempted felony-murder charge and in instructing the jury on that count;

2. Whether the trial court erred in permitting the state to charge defendant with both attempted felony-murder and robbery, the underlying felony;

3. Whether the trial court erred in denying defendant's motion to suppress the victim's pretrial and in-court identifications;

4. Whether the trial court erred in permitting the state to introduce "mug shots" from a photographic array into evidence;

5. Whether the trial court erred in permitting the state to introduce impeachment evidence of defendant's alibi witnesses;

6. Whether references by the state's witnesses and prosecutor to particular evidence was improper and denied defendant a fair trial; and

7. Whether the trial court erred in sentencing defendant.

The record reveals that at approximately 12:45 a.m. on August 22, 1979, Ronald Koger suffered a gunshot wound to the head while on duty as cashier at the Village Pantry food store at 25th Street and Raible Avenue in Anderson, Indiana. According to Koger, his assailant entered the store, requested two cartons of cigarettes, and revealed a handgun he had concealed on his person. Koger testified the man ordered him to kneel on the floor, struck him, fired the nonfatal gunshot, and fled. A subsequent examination of the premises by the store supervisor, Ronald Ferguson, revealed that two cartons of cigarettes and $45.46 in U.S. currency were missing. Based on Koger's description of the perpetrator, a police investigation ensued and culminated in defendant's arrest and convictions for the crimes at issue.

I.

In count one of the information, the state charged that defendant "did knowingly and intentionally attempt to kill another human being" while "in the commission of a robbery." Defendant's alleged conduct, the state charged in the title of count one, violated the provisions of Ind.Code § 35–42–1–1(2), *supra,* and Ind.Code § 35–41–5–1, *supra.*

Detailed in the latter statutory section is the definition of "attempt":

"A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony or misdemeanor of the same class as the crime attempted. However, an attempt to commit murder is a Class A felony." Ind.Code § 35–41–5–1, *supra.*

Embodied within subsection 2 of Ind.Code § 35–42–1–1, *supra,* is the felony-murder rule:

"A person who:

\*　　\*　　\*　　\*　　\*　　\*

"(2) kills another human being while committing or attempting to commit ar-

son, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery:

"commits murder, a felony."

Defendant maintains that "attempted felony-murder" is not defined as a crime in Indiana. He argues the trial court erred in failing to grant his motion to dismiss count one of the information; concomitantly, he asserts the court erred when, over his objection, it instructed the jury on the crime of attempted felony-murder.

The question presented—whether the crime of "attempted felony-murder" exists—is one of first impression. Its resolution requires resort to the principles underlying the felony-murder doctrine.

Our statutory definition of the felony-murder rule embodies the general principles which prompted the common law inception of the doctrine; recognition of the doctrine was predicated on the proposition that inherent to the commission of felonies which were dangerous to life or *malum in se* was the likelihood that death would occur. Consequently, when a death did occur in the course of the commission of an inherently dangerous felony, the common law deemed that the malice or intent necessary to support a conviction for murder could be inferred from the commission or attempted commission of the dangerous felony. *Ex parte Moore,* (1868) 30 Ind. 197; *see also, People v. Aaron,* (1980) 409 Mich. 672, 299 N.W.2d 304, 13 A.L.R. 4th 1180; Perkins, *Criminal Law* § 1, p. 37 (2nd Ed. 1969); LaFave & Scott, *Criminal Law* § 71, p. 545 (1972).

From its inception in sixteenth-century English common law, the doctrine has been the subject of confusion and criticism amongst both courts and commentators, as fully discussed by the Supreme Court of Michigan in *People v. Aaron, supra.* Universally, the source of that consternation has rested in the doctrine's fictionally-based supposition that the perpetrator of an inherently dangerous felony, *as a matter of law,* necessarily acts with the culpability from which the *mens rea* requisite to a murder conviction can be inferred. Debate

has centered on the validity of that presumption in light of the basic premise of criminal law that liability for an act must be commensurate with the culpability or mental state of the perpetrator. Perkins, *supra;* LaFave & Scott, *supra.*

For this reason both Lord Coke and Blackstone suffered a certain ignominy for their early statements of the felony-murder doctrine. Each had defined the doctrine as applicable to a killing of another in the course of *any* felonious act: "And if one intends to do another a felony, and undesignedly kills a man, this is also murder." Perkins, *supra* at 39, citing 4 *Bl.Comm.* 200–201. The courts of nineteenth-century England concluded the doctrine's application should be narrowed for the reason that its presumption was untenable as applied to *all* felonious acts. In its ultimate English common law form, the doctrine was deemed to embrace only those deaths which resulted from any felony committed in a dangerous manner. Perkins, *supra* at 41; *People v. Aaron,* citing *Regina v. Serne,* (1887) 16 Cox.Crim.Cas. 311. Continued criticism of the doctrine, however, culminated in its abrogation by Parliament in 1957. Homicide Act, 1957, 5 & 6 Eliz. 2, c. 11 § 1. In England, malice aforethought is now required to sustain any conviction for murder, regardless of whether the killing occurred in the course of an inherently dangerous felony. Perkins, *supra; People v. Aaron, supra; see generally,* Preverzer, *The English Homicide Act: A New Attempt to Revise the Law of Murder,* 57 *Colum.L.Rev.* 624 (1957).

The historical development of the felony-murder rule in this country has followed a similar course. Troubled by the doctrine's legal presumption of the *mens rea* necessary to support a murder conviction, this nation's jurisdictions also have limited the applicability of the doctrine. Typical of the concerns which have prompted the legislatures and courts of our states to narrow the doctrine's scope is the commentary to Hawaii's murder statute, wherein the felony-murder rule was abolished:

" 'Even in its limited formulation the felony-murder rule is still objectionable. It is not sound principle to convert an accidental, negligent, or reckless homicide into a murder simply because, without more, the killing was in furtherance of a criminal objective of some defined class. Engaging in certain penally-prohibited behavior may, of course, evidence a recklessness sufficient to establish manslaughter, or a practical certainty or intent, with respect to causing death, sufficient to establish murder, but such a finding is an independent determination which must rest on the facts of each case.

\* \* \* \* \* \*

" 'In recognition of the trend toward, and the substantial body of criticism supporting, the abolition of the felony-murder rule, and because of the extremely questionable results which the rule has worked in other jurisdictions, the Code has eliminated from our law the felony-murder rule.' " *People v. Aaron, supra,* 409 Mich. at 703, 299 N.W.2d at 314, 13 A.L.R. 4th at 1196, quoting 7A Hawaii Rev.Stat. § 707–701, Commentary, p. 347 [footnote omitted].

Kentucky's legislature has followed Hawaii's lead, abolishing outright the felony-murder doctrine. Ky.Rev.Stat., § 507.020. Other legislatures have limited the doctrine by reducing the degree of murder and punishment therefor. *See, e.g.,* Alaska Stat. §§ 11.41.110, 11.41.115; La.Rev.Stat.Ann., § 14:30.1; Minn.Stat.Ann. §§ 609.185, 609.-195; N.Y.Penal Law § 125.25 (McKinney); Ohio Rev.Code Ann., § 2903.04 (Page); Pa. Cons.Stat.Ann., tit. 18, § 2502 (Purdon); Utah Code Ann., § 76–5–203(1); Wis.Stat. Ann. §§ 940.02(2), 939.50(3)(b).

Various other limitations have also been imposed by legislative rule. Three states require proof of *mens rea* beyond the intent to commit the underlying felony. Ark.Stat. Ann. § 41–1502; Del.Code, tit. 11, § 636; N.H.Rev.Stat.Ann. § 630:1 I(a), (b). Many jurisdictions have limited the rule by restricting its applicability to deaths caused by the perpetrator of the underlying felony, or by requiring that the decedent be someone other than a co-felon. *See, e.g.,* Ala. Code, § 13A–6–2; Ill.Ann.Stat., ch. 38, § 9–1 (Smith-Hurd); Colo.Rev.Stat., § 18–3–102.

Where legislatures have not preempted the subject, courts have moved to abrogate or limit the common law doctrine. Michigan and New Mexico have dispatched the doctrine altogether. *People v. Aaron, supra,* 409 Mich. at 727, 299 N.W.2d at 326, 13 A.L.R. 4th at 1212 ("... it is no longer acceptable to equate the intent to commit a felony with the intent to kill ..."); *State v. Harrison,* (1977) 90 N.M. 439, 442, 564 P.2d 1321, 1324 ("... a legal fiction we can no longer support"). Other state courts have limited the doctrine's scope in the various ways of the legislatures heretofore discussed. *See, e.g., People v. Phillips,* (1966) 64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353; *State v. Galloway,* (Iowa 1979) 275 N.W.2d 736; *State v. Moffit,* (1967) 199 Kan. 514, 431 P.2d 879; *State v. Glover,* (1932) 330 Mo. 709, 50 S.W.2d 1049; *State v. Montgomery,* (1974) 191 Neb. 470, 215 N.W.2d 881; *Commonwealth ex rel. Smith v. Myers,* (1970) 438 Pa. 218, 261 A.2d 550. The prevailing American attitude toward the felony-murder doctrine was accurately summarized by the Supreme Court of Pennsylvania:

"[W]e do want to make clear how shaky are the basic premises on which [the felony murder rule] rests. With so weak a foundation, it behooves us not to extend it further and indeed, to restrain it within the bounds it has always known." *Commonwealth ex rel. Smith v. Myers, supra,* 438 Pa. at 227, 261 A.2d at 555.

*Accord, People v. Phillips, supra;* Perkins, *supra,* LaFave & Scott, *supra; see also,* Note, *Recent Extension of Felony Murder Rule,* 31 Ind.L.J. 534 (1956); Note, *Felony Murder as a First Degree Offense: An Anachronism Retained,* 66 Yale L.J. 427 (1957).

This jurisdiction has also limited the scope of the doctrine. By statute, its applicability is confined to the killing of another "while committing or attempting to commit" any of seven enumerated felonies:

"arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery." Ind.Code § 35–42–1–1(2), *supra.*

■ Obviously, our felony-murder rule *does not require* that the underlying felony be completed; the statute has been expressly made applicable to the killing of another during the *attempted* commission of the enumerated felonies. In that sense, the crime of "attempted felony-murder" can be said to exist in Indiana.

■ We conclude, however, that whether the underlying felony has been completed or attempted, the felony-murder rule cannot be applied unless the death of another occurred by virtue of the commission or attempted commission of the underlying felony. In other words, absent death the applicability of the felony-murder rule is never triggered. Our conclusion is prompted for several reasons, amongst which is the role the doctrine's legal presumption would play in circumstances where no death has occurred.

Indiana continues to adhere to the proposition of law that the state, in attempting to prove a felony-murder charge, need only establish that the defendant intended to commit the underlying felony; no evidence of an intent to kill need be introduced. *Vertner v. State,* (1980) Ind., 400 N.E.2d 134; *Cade v. State,* (1976) 264 Ind. 569, 348 N.E.2d 394; *Wilson v. State,* (1975) 263 Ind. 469, 333 N.E.2d 755. This Court stated in *Vertner v. State, supra:*

> "This Court has held that when there is a killing in the perpetration or attempt to perpetrate a robbery under this statute, the homicide is murder in the first degree even though there is no actual purpose or intent to kill on the part of the defendant. *Jones v. State* (1964) 244 Ind. 682, 195 N.E.2d 460, *cert. denied* (1972) 408 U.S. 927, 92 S.Ct. 2511, 33 L.Ed.2d 339." *Id.,* Ind., 400 N.E.2d at 136.

As previously explained, it is this aspect of the doctrine—the elimination of the prosecutor's burden to prove an essential element of the crime of murder—which has prompted widespread disfavor toward the rule.

Where no death has occurred, the arguability of that presumption is heightened. We do not believe the fact that bodily injury has occurred in the commission or attempted commission of one of the seven statutorily-enumerated felonies warrants the presumption that, as a matter of law, the perpetrator possessed the *mens rea* requisite to murder. Nor does our criminal code reflect an intention on our legislature's part to establish such a rule.

Our General Assembly has provided the state with the tool by which to impose increased liability upon the perpetrator of any of the seven felonies enumerated in Ind.Code § 35–42–1–1(2), *supra,* if the offense results in bodily injury. The statutes defining the various underlying felonies each provide that if bodily injury results, the crime is of class A felony status, punishable by a basic period of thirty years' imprisonment. See, Ind.Code § 35–43–1–1 (Burns 1979 Repl.) (arson); Ind.Code § 35–43–2–1 (Burns 1979 Repl.) (burglary); Ind. Code § 35–42–4–3 (Burns 1979 Repl.) (child molesting); Ind.Code § 35–42–4–2 (Burns 1979 Repl. (criminal deviate conduct); Ind. Code § 35–42–3–2 (Burns 1979 Repl.) (kidnapping); Ind.Code § 35–42–4–1 (Burns 1979 Repl.) (rape); Ind.Code § 35–42–5–1 (Burns 1979 Repl.) (robbery).

Pursuant to the above statutes, an *intent* to inflict bodily injury is not required to elevate the particular crime to one of class A status; the state need only show the defendant possessed the intent to commit the particular crime and that bodily injury occurred in the commission or attempted commission of it. The rule that intent to inflict bodily injury is not required is based on the same rationale which underlies the felony-murder rule—the recognition that the crimes carry the inherent risk of bodily harm. *Moon v. State,* (1981) Ind., 419 N.E.2d 740; *Bailey v. State,* (1980) Ind., 412 N.E.2d 56.

To extrapolate that supposition and hold that the fact of bodily injury establishes as a matter of law the *mens rea* requisite to murder would create a rule unrelated to the mental state or moral culpability of any

particular defendant. We have recognized that "bodily injury" includes a "knot" on the head or a deep sinus bruise coupled with nosebleeds and recurring headaches. *Gatewood v. State,* (1982) Ind., 430 N.E.2d 781; *Clay v. State,* (1981) Ind., 416 N.E.2d 842. It does not follow that in purely arbitrary circumstances, the legislature intended to create a discretionary vehicle whereby the state could seek a conviction for attempted murder without an obligation to prove the intent to kill.

Consequently, we hold that the applicability of the felony-murder doctrine is triggered only when the death of another results during the commission or attempted commission of the seven felonies enumerated in Ind.Code § 35–42–1–1(2), *supra.* The Supreme Court of Illinois has reached the same conclusion:

> "There can be no felony murder where there has been no death, and the felony murder ingredient of the offense of murder cannot be made the basis of an indictment charging attempt murder. Moreover, the offense of attempt requires an 'intent to commit a specific offense' (Ill. Rev.Stat.1973, ch. 38, par. 8–4), while the distinctive characteristic of felony murder is that it does not involve an intention to kill. There is no such criminal offense as an attempt to achieve an unintended result." *People v. Viser,* (1975) 62 Ill.2d 568, 581, 343 N.E.2d 903, 910.

The Court's rationale is of equal force in this jurisdiction. *Cf., Humes v. State,* (1981) Ind., 426 N.E.2d 379 (crime of "attempted recklessness" does not exist).

■ Our decision does not, of course, alter the traditional application of the felony-murder doctrine, which is ensconced within our criminal law by statute. We merely refuse to extend the scope of the doctrine beyond the pale of its statutory design and logical underpinnings. Where an intent to murder is exhibited in the course of any of the underlying felonies but no death occurs, attempted murder may still be charged and

proven pursuant to Ind.Code § 35–42–1–1(1), *supra.*

■ Although we agree with defendant's contention that absent death of the victim, the crime of attempted felony-murder does not exist in Indiana, we nonetheless conclude that the trial court did not err in denying his motion to dismiss. That is so because the language employed in the charging instrument satisfied the constitutional requirement that defendant be apprised of the "nature and cause of the charge against him." Ind. Const. art. 1, § 13. The notice requirement provides a defendant with the opportunity to know the accusation against him so that he may anticipate the proof and prepare a defense in advance of trial. The formal and substantive requirements of a valid information or indictment are defined in Ind.Code § 35–3.-1–1–2 (Burns 1979 Repl.),[1] which was enacted to effectuate the constitutional guarantee.

The statute reads in pertinent part:

> "(a) The indictment or information shall be in writing and allege the commission of an offense by:
> "(1) Stating the title of the action and the name of the court in which the indictment or information is filed;
> "(2) Stating the name of the offense in the words of the statute or any other words conveying the same meaning;
> "(3) Citing the statutory provision alleged to have been violated except that any failure to include such a citation or any error in such a citation shall not constitute grounds for reversal of a conviction where the defendant was not otherwise misled as to the nature of the charges against him;
> "(4) Setting forth the nature and elements of the offense charged in plain and concise language without unnecessary repetition...." *Id.*

In the title of the information filed against defendant, the state cited subsection 2 of

---

1. The statute was repealed effective September 1, 1982, by Acts 1981, P.L. 298. For present law, *see* Ind.Code § 35–34–1–2 (Burns 1982 Supp.). Ind.Code § 35–3.1–1–2, *supra,* governs our disposition here by virtue of Section 9(b) of Acts 1981, P.L. 298.

Ind.Code § 35–42–1–1, *supra* (felony-murder), and Ind.Code § 35–41–5–1, *supra* (attempt). As explained heretofore, the state's reliance on these statutory provisions was improper. Pursuant to subsection 3 of Ind.Code § 35–3.1–1–2, *supra,* however, the state's error in citation does not warrant reversal if defendant "was not otherwise misled as to the nature of the charge against him." *See generally, Fletcher v. State,* (1961) 241 Ind. 409, 172 N.E.2d 853.

We conclude defendant was not otherwise misled. The substantive allegations contained in the information included the statement that defendant "did knowingly and intentionally attempt to kill another human being." It was alleged that defendant shot the victim in the head with a handgun in the course of a robbery, "all of which constituted a substantial step toward the commission of the crime of Murder."

The information thus included all the elements necessary to charge attempted murder as defined in subsection 1 of Ind.Code § 35–42–1–1, *supra;* the "intent" necessary to a conviction under the statute was alleged as required. *McCormick v. State,* (1954) 233 Ind. 281, 119 N.E.2d 5. The circumstances surrounding the shooting were fully detailed. Consequently, we agree with the trial court that the allegations were sufficient to inform the defendant that he was charged with attempting to murder the victim. The trial court did not err in denying defendant's motion to dismiss. *Roberts v. State,* (1978) 268 Ind. 348, 375 N.E.2d 215; *Madison v. State,* (1955) 234 Ind. 517, 130 N.E.2d 35; *Brown v. State,* (1980) Ind.App., 403 N.E.2d 901.

■ Nonetheless, defendant's conviction under the count for attempted murder must be reversed. Consistent with the caption of the charging instrument, the trial court instructed the jury on the attempted murder charge in a manner which embodied the elements of felony-murder outlined in Ind. Code § 35–42–1–1(2), *supra.* Over defendant's objection, the court's preliminary instructions informed the jury that "The elements as they apply to this case, to Count 1, Attempted Murder" were:

"The accused must; * * *

1. attempt to kill,

2. another human being,

3. while committing or attempting to commit: * * *

 g. robbery."

Deleted from the instruction was subsection 1 of Ind.Code § 35–42–1–1, *supra, including the element of specific intent;* the instruction tracked subsection 2 of Ind.Code § 35–42–1–1, *supra,* excluding all of the enumerated felonies excepting robbery. The final instructions given by the trial court included the definitions contained in both subsections 1 and 2 of Ind.Code § 35–42–1–1, *supra.* Although the court also gave an instruction which stated that "A person commits the crime of attempted murder when he knowingly or intentionally does any act which constitutes a substantial step toward the commission of the crime of Murder," *it is well settled that it cannot be presumed the effect of a bad instruction is cured by giving a proper one. See, e.g., Brewer v. State,* (1969) 253 Ind. 154, 252 N.E.2d 429; *Mundy v. State,* (1966) 247 Ind. 224, 214 N.E.2d 389; *Harrington v. State,* (1980) Ind.App., 413 N.E.2d 622. As this Court recently stated: "A general verdict can not stand when the case was tried and submitted on two theories, one bona fide and the other not." *Miller v. State,* (1981) Ind., 417 N.E.2d 339, 343, citing *Bachellar v. Maryland,* (1970) 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570, and *Williams v. North Carolina,* (1942) 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279; *accord, Britton v. Garrison,* (1970) 147 Ind.App. 264, 259 N.E.2d 417.

That is the case here. Via the preliminary and final instructions, the jury was provided with *two inconsistent and contradictory theories of law* regarding an *essential* element of attempted murder: *the intent to commit the crime.* Consistent with our own case precedent and, like the Supreme Court of Illinois, we must reverse and vacate the judgment and sentence imposed on the attempted murder charge. *Miller v. State, supra; Brewer v. State, supra; Mundy v. State, supra; Harrington v. State, supra; People v. Viser, supra.* In-

sofar as the attempted murder charge is concerned, the cause is remanded to the trial court for further proceedings not inconsistent with this opinion. *Id.*

The remainder of our opinion is addressed to those issues raised by defendant which bear on his conviction and sentence for robbery. *That is a matter unrelated to the instructional errors upon which the reversal of his attempted murder conviction is based.*

## II.

■ Defendant maintains that the trial court committed fundamental error when it permitted the state to charge him with robbery as well as attempted murder in the commission of a robbery. He argues that the robbery charge was improper because robbery is one of the seven underlying felonies of Ind.Code § 35–42–1–1(2), as cited by the state in the charging instrument.

His argument is without merit. If the attempted murder count had been proper under Ind.Code § 35–42–1–1(2), *supra,* the state would not have been precluded from also charging defendant with the underlying crime of robbery.[2] *Biggerstaff v. State,* (1982) Ind., 432 N.E.2d 34; *Roberts v. State,* (1978) 268 Ind. 348, 375 N.E.2d 215. As we have previously explained, however, the state charged defendant with the intent necessary to bring the count within the ambit of Ind.Code § 35–42–1–1(1), *supra;* it is axiomatic that via separate counts, the state may charge a defendant with both attempted murder and robbery when the offenses are part of the same transaction, for each of the crimes embodies an essential element distinct from the other. *Cf., Clay v. State,* (1982) Ind., 440 N.E.2d 466 (convictions for attempted murder and attempted robbery upheld); *Wilson v. State,* (1981) Ind., 418 N.E.2d 1150 (convictions for attempted murder and robbery upheld).

## III.

Prior to trial, defendant filed a motion to suppress evidence regarding two out-of-court identifications of defendant by the victim; via the motion, defendant also sought to prohibit any in-court identification of defendant by the victim. Following a hearing on the motion, it was overruled by the trial court. Over defendant's objection at trial, evidence of the victim's out-of-court identifications was admitted; likewise, the victim was permitted to make an in-court identification of the defendant as the man who had robbed him. Defendant here renews his contentions that the out-of-court and in-court identifications were improperly admitted.

The record reveals that immediately after the robbery, the victim, Ronald Koger, telephoned the Anderson Police Department and described the perpetrator as a "black male, 5'8" to 5'10" in height, 150 to 160 pounds with medium complexion, medium length Afro haircut ... wearing a black shirt with white buttons and black pants." Three days after the incident, when Koger had been released from the hospital, a photographic display was shown to him at the Anderson City Police Department.

According to Koger, Anderson Police Detective David Levi first asked him to look through two books of photographs. As he was perusing the books and identifying facial characteristics and hair styles peculiar to the perpetrator, he "noticed" the picture of defendant and "kept track as to where it was in the book." After he had looked through both books, Detective Levi removed the books and, outside Koger's presence, selected six photographs from the array. He placed the stack of six photographs on the desk in front of Koger for examination; Koger spread the photographs on the desk and identified defendant from the photos as the perpetrator of the robbery.

Defendant's challenge to the propriety of the procedures employed at the photographic display rests on the nature of the six-photograph array presented for Koger's exami-

**2.** If a defendant is convicted of both felony-murder and the underlying felony, the merger doctrine operates to preclude judgment and sentencing on both crimes. *Biggerstaff v. State, supra.*

nation. In four of the six photographs, the subjects bore readily-apparent facial hair, varying from close-cropped beards and mustaches to goatees and long sideburns. In the other two photographs, including that of defendant, neither of the subjects bore discernible facial hair. Defendant maintains this discrepancy in the photographic array rendered it unduly suggestive, warranting the suppression of the identification therefrom.

■ The practice of exhibiting a number of photographs to the victim of a crime for the purpose of seeking the identity of the perpetrator is not, as a general proposition, an impermissible investigative method. *Simmons v. United States,* (1968) 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247; *Wilson v. State,* (1981) Ind., 418 N.E.2d 1150. When the display is accompanied by verbal communications or includes graphic characteristics which distinguish and emphasize a defendant's photograph in an unduly suggestive manner, however, the procedure is condemned as violative of due process. *Simmons v. United States, supra; Wilson v. State, supra.*

■ In its brief, the state has not addressed the contention that the photographs were unduly suggestive by virtue of the disparity of facial hair amongst the subjects pictured thereon. It maintains the identification was proper because Koger was not informed that the defendant or a suspect was among the six photographs. That fact, although significant, is not dispositive of the question whether the identification was the product of unduly suggestive procedures. *Simmons v. United States, supra; Sawyer v. State,* (1973) 260 Ind. 597, 298 N.E.2d 440. The question is one which, on a case-by-case basis, is resolved by an examination of the totality of circumstances surrounding the array and identification. *Simmons v. United States, supra; Wilson v. State, supra.*

■ Here, we conclude the display was not so unduly suggestive as to render the identification therefrom inadmissible. The subjects displayed thereon were all black

males of relatively similar ages, complexions, and hair styles. Coupled with these circumstances is the fact that prior to the six-photograph display, the victim's recollection of the perpetrator had prompted him to note defendant's photograph from the two books of photographs. In view of these circumstances, including the fact that the victim had not been informed that a suspect was present, we conclude that Koger's identification was not the product of an unduly suggestive photographic display. *Cf., Harris v. State,* (1981) Ind., 427 N.E.2d 658 (photographs of men with beards included in display where perpetrator described as "clean-shaven"); *Shepard v. State,* (1980) Ind., 404 N.E.2d 1 (six-photograph array included only two subjects with light complexions and clean-shaven faces); *Himes v. State,* (1980) Ind., 403 N.E.2d 1377 (defendant was only subject in seven-photograph array to prominently display teeth and victim had described perpetrator's teeth as "rotten" or "bad"). There was no error in admitting evidence of the photographic identification.

Defendant also challenges the admissibility of evidence regarding the victim's identification of him at a pretrial confrontation. The record reveals that the confrontation occurred roughly eighteen days after the crime at the Anderson City Police Department. Anderson police officers were interrogating defendant when he requested the confrontation, as Detective Gary Burke explained:

"When I was interrogating Curtis Head, he had been advised of his rights prior to the questioning. I remember that particular time only when we talked to Mr. Head it was the 10th of September, I believe, he was advised of his rights. He stated that he understood each of his rights and he signed a waiver. We proceeded to interview him and he denied any and all charges. About an hour and a half into the interview he said 'I'm not the man you're looking for' he said 'I demand that you bring this man in and let him tell me to my face that I shot him' he said 'he will not do that because I didn't do it' and I asked him I said 'you're

asking that this man be brought here' he said 'that's right' he said 'that's exactly what I want' he said 'let him look at me face to face.' Well, we called Mr. Koger and we didn't want to give him a false pretense or implant something in his head prior to his arrival and I had—I called Mr. Koger and told him that I would like to talk to him and if possible we could release some of his personal items. Thinking that as long as he didn't know that we wanted to show him anyone that could be involved it wouldn't prejudice his thinking."

Consistent with Burke's testimony, Koger testified that he arrived at the station unaware that a suspect was in custody. He testified that when he arrived, he went to the detective's squad room and asked for Detective Burke.

Burke and the defendant were seated inside an adjacent room when Koger arrived at the detective's squad room. A detective went to the doorway of the adjacent room and informed Burke that a "complainant" wished to speak with him. Burke proceeded to the doorway and approached Koger.

From his position at Detective Burke's desk in the squad room, Koger could see defendant through the open doorway. Without prompting from the detectives, Koger informed them "that man is the guy that shot me." According to Burke, he asked Koger, "What man?" Koger then pointed at defendant, stating "I'm sure." Burke then took Koger to a one-way wall mirror to view defendant. At Burke's behest, defendant stood about three feet from the one-way mirror and provided Koger with front and side views of himself. Again Koger unequivocally identified him as the perpetrator. Koger was then taken into the room where defendant was seated. Defendant was asked "if he knew this man [Koger]"; according to Burke, defendant "just kept his head down" and would not look at Koger.

Defendant first argues the pretrial confrontation was improper because it was conducted without his attorney present. Inasmuch as defendant had been charged with the robbery prior to the confrontation, there is no question that he had a right to have counsel present during the confrontation. *Kirby v. Illinois,* (1972) 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411; *Hatcher v. State,* (1981) Ind., 414 N.E.2d 561. The record reveals, however, that defendant's request to confront the victim had been preceded by a waiver of his right to counsel. Defendant has not challenged the veracity of the signed waiver form which is present in the record, nor does it appear the waiver was somehow improperly obtained.

We agree with defendant's contention, however, that notwithstanding the fact that he requested the confrontation, he remained entitled to an identification proceeding which was not unduly or unnecessarily suggestive.

In that respect, the police acted properly by not informing Koger that he was about to confront a suspect. At the same time, however, the circumstances surrounding the identification lead us to conclude that it was the product of unnecessary and improper procedures. This Court has often recognized that *inherently,* one-on-one confrontations between a suspect and victim are very suggestive. *See, e.g., Poindexter v. State,* (1978) 268 Ind. 167, 374 N.E.2d 509; *Cooper v. State,* (1977) 265 Ind. 700, 359 N.E.2d 532. Generally speaking, we have found one-on-one confrontations proper only in circumstances where it occurred immediately subsequent to the incident under investigation. *See, e.g., Whitlock v. State,* (1981) Ind., 426 N.E.2d 1292 (confrontation occurred forty-five minutes after armed robbery); *Poindexter v. State, supra* (show-up fifteen minutes after robbery at scene of crime); *Atkins v. State,* (1977) 175 Ind.App. 230, 370 N.E.2d 985 (show-up ten minutes after robbery). Confrontations occurring shortly after the commission of the crime have been held to be proper because of the value of permitting a witness to view a suspect while the image of the perpetrator is fresh in the witness's mind. *Id.* Likewise, one-on-one confrontations have been found proper where circum-

stances rendered an alternative approach such as a lineup impossible. *See, e.g., Duffy v. State,* (1981) Ind., 415 N.E.2d 715 (fact that victim was hospitalized rendered lineup impractical); *Swope v. State,* (1975) 263 Ind. 148, 325 N.E.2d 193 (fact that hospitalized victim was in critical condition rendered lineup impossible).

Here, the confrontation between defendant and the victim occurred nearly three weeks after the commission of the robbery. The circumstances did not require that a one-on-one confrontation occur; a lineup easily could have been arranged. While the police did not inform the victim that he would view a suspect, he was, nonetheless, summoned to the police station for that purpose. When he arrived, the victim was permitted to view the defendant in the presence of the officer investigating the crime; thereafter, he viewed the defendant through a one-way mirror while the defendant was commanded to stand and provide frontal and side views of himself at a distance of approximately three feet. As in *Holt v. State,* (1979) Ind., 396 N.E.2d 887, 889, where this Court confronted similar circumstances, we "conclude that the procedures employed by the police were unnecessarily and impermissibly suggestive." *Cf., Carmon v. State,* (1976) 265 Ind. 1, 349 N.E.2d 167 (one-man lineup conducted two weeks after robbery improper); *Griffin v. State,* (1976) 171 Ind.App. 543, 357 N.E.2d 917 (victim's presence not requested by police a factor in upholding legality of spontaneous confrontation). Consequently, the evidence concerning Koger's identification of the victim at the one-on-one confrontation three weeks after the robbery was improper.

■ Concomitantly, defendant argues that the in-court identification of defendant was a product of the improper pretrial confrontation and should not have been permitted. We disagree. In cases wherein an unnecessarily suggestive pretrial confrontation has occurred, at issue is whether a substantial likelihood of irreparable misidentification has occurred. *Neil v. Biggers,* (1972) 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401; *Holt v. State, supra; Swope v. State, supra.* In order for a subsequent in-court identification to be admissible, the state has the burden of producing clear and convincing evidence that, independent of the unconstitutional pretrial confrontation, the witness has a basis for the identification made in court. *Id.*

■ The question whether an independent basis exists is resolved by examining the totality of the circumstances, including both the witness's opportunity to observe the perpetrator during the crime and the nature of the suggestive pretrial identification. *Remsen v. State,* (1981) Ind., 428 N.E.2d 241; *Love v. State,* (1977) 266 Ind. 577, 365 N.E.2d 771.

■ As the state maintains, the evidence reveals in clear and convincing fashion that an independent basis for the victim's in-court identification did exist. The victim Koger testified that on the night of the robbery, the perpetrator twice visited the Village Pantry food store where Koger was acting as cashier. The first occasion occurred at approximately 11:00 p.m., not quite two hours before the crime. According to Koger, the perpetrator entered the store, examined the pop cooler and bread rack, and, without selecting any purchases, approached the counter. There, he inquired about employment opportunities at the store; he eventually solicited an application from Koger and left the premises. The entire encounter lasted two to three minutes.

Koger testified that the same man returned at approximately 12:45 a.m. He attributed his recall of the man's earlier visit to a policy of the store—owing to a shoplifting problem—to "routinely examine people who come in alone and especially late at night." The man entered via the front door, approached the counter, and asked whether cigarettes were available by the carton. When informed that cartons were available, an exchange followed concerning the brands of cigarettes in stock. The man requested two cartons. Koger testified that he put the cigarettes on the counter and rang up the sale on the cash register.

He then turned to the man and informed him of the price, but received no response. Koger repeated the price; again receiving no response, he looked down at defendant's hands and saw a cocked revolver pointed toward him. The man informed him it was a robbery. Koger stepped back, his hands held high in the air, and told the perpetrator he could "have the money." Koger then withdrew all the bills in the cash register and placed them on the counter. Thereafter, the man motioned Koger to lie facedown on the floor, struck and shot him, and fled. Koger testified that the encounter lasted five minutes.

After the perpetrator had fled, Koger telephoned the police and described the man as a black male of medium complexion, approximately 5'8" to 5'10" in height, and bearing a mustache, goatee, sideburns, and medium length "Afro" haircut. Koger also described the man as approximately twenty-three to twenty-nine years old, of medium build, and clad in a black buttoned-down shirt and black pants.

This evidence is sufficient to establish that an independent basis for Koger's in-court identification did exist independent of the unnecessarily suggestive pretrial confrontation. Within a period of two hours, the victim Koger—whose practice it was to study customers—twice viewed the perpetrator within the confines of the convenient food store lighting. Those confrontations totaled seven to eight minutes in duration; during most of the time, the perpetrator and Koger were face-to-face across the store counter—a distance of approximately three feet.

Although the pretrial confrontation occurred by virtue of unnecessary and improper procedures, that identification had been preceded by a properly obtained photographic identification. In light of these various circumstances, including the ample opportunity which Koger had to view the perpetrator, we conclude that his in-court identification was based on observations gained independently of the suggestive pretrial confrontation. *Johnson v. State,* (1982) Ind., 432 N.E.2d 403; *Whitlock v.*

*State,* (1981) Ind., 426 N.E.2d 1292; *Sawyer v. State,* (1973) 260 Ind. 597, 298 N.E.2d 440. Defendant asserts that discrepancies between Koger's description of the perpetrator and the defendant's physical characteristics belie the above conclusion; those discrepancies, however, affected the weight and credibility to be accorded the in-court identification, not its admissibility. *Cobb v. State,* (1980) Ind., 412 N.E.2d 728; *Fields v. State,* (1975) 263 Ind. 550, 333 N.E.2d 742; *Stephens v. State,* (1973) 260 Ind. 326, 295 N.E.2d 622. The in-court identification was properly admitted.

 Inasmuch as the photographic identification and in-court identification were properly admitted and were unequivocal in nature, we conclude that the admission of the pretrial identification obtained via the confrontation, although improper, was harmless beyond a reasonable doubt. *Chapman v. California,* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; *Tewell v. State,* (1976) 264 Ind. 88, 339 N.E.2d 792; *Owens v. State,* (1975) 263 Ind. 487, 333 N.E.2d 745; *Eckman v. State,* (1979) Ind.App., 386 N.E.2d 956. No reversible error has been demonstrated here.

### IV.

Defendant next asserts the trial court erred when it permitted the state to introduce a "mug shot" of the defendant into evidence, thereby indicating to the jury that defendant had a prior criminal record. The "mug shot" was admitted over defendant's objection as part of the photographic array in which the victim made his initial identification of defendant; the photograph of the defendant had been taken in connection with a prior unrelated charge.

 "Mug shots" are generally inadmissible in Indiana for the potential prejudice to defendants which is engendered by the admission of the photographs; the general proscription is based on the feared influence the photographs, which tend to reveal or imply a defendant has a criminal record, might have on the jury. *Strong v. State,* (1982) Ind., 435 N.E.2d 969; *Gray v. State,*

(1978) 268 Ind. 177, 374 N.E.2d 518; *Vaughn v. State,* (1939) 215 Ind. 142, 19 N.E.2d 239. In order for a "mug shot" to be admissible, the state must show that the photograph is not unduly prejudicial and that it has substantial evidentiary value independent of other evidence. *Id.*

█ Here, the state properly had securely covered the law enforcement inscription at the bottom of the picture. *Strong v. State, supra; Richey v. State,* (1981) Ind., 426 N.E.2d 389. Nor was any evidence of prior criminal activity apparent on the image present; the photograph included only a frontal view of defendant from his shoulders upward. No companion profile shot was included, nor were a chain and police identification plate hanging from defendant's neck, as decried in *Strong.* The photograph of defendant, albeit obtained from police files, was not unduly prejudicial. *Strong v. State, supra; Richey v. State, supra.*

The photograph also had independent evidentiary value of a substantial nature. It explained and corroborated the fact that prior to trial, the victim had identified defendant as the perpetrator. To be sure, the photographic identification served to buttress the in-court identification, as defendant argues. It also bore independent probative force, however. Standing alone, the fact that the evidence of the unequivocal photographic identification was admitted would have been sufficient to establish the state's case and sustain a guilty verdict, had the victim been unable to make an in-court identification. *Richardson v. State,* (1979) 270 Ind. 566, 388 N.E.2d 488. Unlike *Vaughn v. State, supra,* upon which defendant relies, the victim had not yet testified and made an unequivocal in-court identification. The evidence of the pretrial identification was properly admitted as it was not unduly prejudicial and had independent probative value on the dispositive issue at trial—the identity of the perpetrator. *Strong v. State, supra; Richey v. State, supra; Richardson v. State, supra.*

V.

Defendant next maintains the trial court erred in permitting the state to introduce evidence designed to impeach the credibility of his witnesses. During defendant's case, the testimony of witnesses John Dixon and Richard Nunn had been presented to establish his alibi defense. In rebuttal, the state introduced the testimony of Police Officers Gary Burke and Chuck Johnson, wherein the credibility of Dixon and Nunn was attacked. Defendant maintains the testimony was improper because it included opinion testimony without a proper foundation and specific acts of misconduct.

█ During Burke's testimony, he stated that Dixon had been arrested for robbery in 1977. Defense counsel objected and the state agreed that the remark should be stricken. Defendant's argument that the statement was improper is a *non sequitur;* the state conceded it was improper and should be stricken. It was incumbent upon defendant to then see that the jury was properly admonished, if that motion was deemed appropriate as a trial tactic. *Reid v. State,* (1978) 267 Ind. 555, 372 N.E.2d 1149.

█ Burke was also asked to describe Dixon's reputation for "truthfulness" and whether, in Burke's opinion, Dixon "tells the truth." Burke described Dixon's reputation as "None he is a perjurer" and stated "I know he doesn't" in response to the question whether Dixon told the truth. Although defendant here challenges the propriety of the testimony, he has waived his allegation of error by failing to object at trial. *Gosnell v. State,* (1978) 268 Ind. 429, 376 N.E.2d 471; *Richard v. State,* (1974) 262 Ind. 534, 319 N.E.2d 118.

Officer Burke was also asked whether he knew Richard Nunn's reputation for truthfulness in the community. Over defendant's objection that Burke did not know Nunn, the witness was allowed to testify that Nunn's reputation was not "one of truthfulness." Relying on *City of South Bend v. Turner,* (1904) 163 Ind. 194, 71 N.E. 657, defendant asserts the testimony was improper because Burke testified he had never spoken with Nunn.

■ Defendant misconstrues the nature of the rule regarding character evidence, as well as this Court's holding in *City of South Bend v. Turner, supra.* The admissibility of impeachment evidence regarding a witness's general reputation in the community for veracity is not dependent upon proof that the impeaching witness has met or talked with the subject of the impeachment. Rather, the admissibility of the reputation evidence is dependent upon whether the impeaching witness has knowledge of the *general* reputation for veracity of the witness to be impeached. The rationale for admitting such evidence is that it represents not a personal opinion based on a single incident or instance of human interaction, but rather that it represents the distillation of a community of opinions. *Meyncke v. State,* (1879) 68 Ind. 401; *see also,* 3A Wigmore on Evidence § 920 et seq. (Chad.rev.1970). In *City of South Bend v. Turner, supra,* this Court merely held that a person who had no knowledge of a witness *except what one person had said about the witness* was not qualified to testify concerning the character of the witness. Our holding was based on the fact that the evidence offered did not represent the distillation of numerous opinions, but rather the opinion of one person repeated secondhand. Defendant's objection was properly overruled; personal knowledge of or experience with the witness to be impeached is not necessary to the admission of evidence concerning his general reputation for veracity. *Meyncke v. State, supra.* There was no error here.

■ Defendant also challenges the admissibility of the reputation evidence on the basis that Burke did not explain where he acquired his knowledge of community opinion. The argument has been waived, however, for defendant did not tender this specific objection at trial. *Phelan v. State,* (1980) Ind., 406 N.E.2d 237; *Carman v. State,* (1979) Ind., 396 N.E.2d 344.

## VI.

■ Defendant maintains that various instances of prosecutorial misconduct operated to deny him a fair trial. First, he complains that the term "mug shots" or "mug books" was employed both by witnesses of the state and by the prosecutor. The witnesses' references to the term occurred during the state's case-in-chief, while the prosecutor's usage of the phrase occurred during final argument.

This jurisdiction has decried verbal references in court to "mug shots," recognizing the term bears adverse and improper connotations for the defendant. *Richey v. State,* (1981) Ind., 426 N.E.2d 389; *Fox v. State,* (1980) Ind.App., 399 N.E.2d 827; *Bayer v. State,* (1973) 158 Ind.App. 531, 303 N.E.2d 678. Nonetheless, the record reveals that defendant did not object to any of the usages of the term during the trial. By his failure to object, defendant has waived his allegation of error. *Moon v. State,* (1981) Ind., 419 N.E.2d 740; *Holt v. State,* (1980) Ind., 408 N.E.2d 538.

■ Defendant also asserts that the state was improperly permitted to make reference to "an anonymous tip" the police had received via telephone. The information gained by the "tip" assisted the police in their investigation and in their determination of which photographs should be included in any arrays presented to the victim. When Anderson Police Detective David Levi referred to the "anonymous tip," defendant objected to the testimony on the basis that it constituted hearsay. The record reveals, however, that Levi neither revealed the name of the informant nor the contents of the telephone conversation; consequently, the fact that an anonymous tip occurred was not hearsay. Defendant's objection would have been appropriate had the contents of the telephone conversation been admitted for the truth of the matters asserted therein. *Roberts v. State,* (1978) 268 Ind. 348, 375 N.E.2d 215. As it was, however, the fact that the tip had occurred was offered for the purpose of establishing the manner in which the police conducted their investigation. The trial court did not err in permitting Levi to testify. *Id.* Defendant also maintains it was improper for the prosecutor to refer to

the "anonymous tip" during final argument. Defendant did not object to the prosecutor's usage of the phrase, however, thereby failing to preserve the issue for review. *Moon v. State, supra; Holt v. State, supra.* As per our foregoing analysis, however, the prosecutor's reference was not improper.

■ Defendant also maintains that the prosecutor engaged in misconduct during cross-examination of his alibi witnesses. The various witnesses were members of or affiliated with a group of basketball players known as the "Nightriders." The prosecutor asked each of the witnesses whether the "Nightriders" was a "gang," sometimes referring to the group as a "gang . . . called the Nightriders." Each of the witnesses steadfastly denied that the "Nightriders" was a "gang"; they explained that the group was organized solely for the purpose of basketball and that local basketball star Bobby Wilkerson had appended the name "Nightriders" to the group because of their penchant for night basketball.

Defendant challenges the propriety of the prosecutor's questioning on the basis that it constituted cross-examination by innuendo and lacked any evidentiary basis. Defendant did not object at trial during any of the prosecutor's questions concerning the "Nightriders," however; any error was consequently waived. *Moon v. State, supra; Holt v. State, supra.* Furthermore in light of the witnesses' repeated statements that the group concerned itself with basketball and was not, in any negative sense, a "gang," the prosecutor's comments could not have placed defendant in such grave peril that a new trial was warranted. *Remsen v. State,* (1981) Ind., 428 N.E.2d 241; *Maldonado v. State,* (1976) 265 Ind. 492, 355 N.E.2d 843.

## VII.

■ Defendant's final contention concerns the propriety of the sentences imposed on his convictions for attempted felony murder and robbery, a class A felony. Variously, he argues the cumulative eighty-year sentence imposed on him was manifestly unreasonable, constituted cruel and unusual punishment, and violated the double jeopardy prohibition. He also maintains the sentences should have run concurrently rather than consecutively.

His arguments have been preempted by our disposition of Issue I, however, wherein we vacated the judgment and sentence imposed on defendant's conviction for attempted murder. Defendant has not specifically challenged the thirty-year sentence imposed on his conviction for robbery as a class A felony. We note that the thirty-year sentence imposed was the determinate period fixed by statute; consequently, the trial court was not required to make a statement of any aggravating circumstances considered in the sentencing. Ind.Code § 35–50–2–4 (Burns 1979 Repl.); Ind.Code § 35–4.1–4–3 (Burns 1979 Repl.); *Kusley v. State,* (1982) Ind., 432 N.E.2d 1337. Consequently, there is no sentencing issue present for review; those questions raised by defendant may, of course, be revived, depending upon the disposition of his attempted murder count on remand.

For all the foregoing reasons, there was no reversible error with respect to defendant's conviction for robbery, a class A felony; the judgment and sentence imposed thereon are affirmed. For the reasons discussed in Issue I, the judgment and sentence imposed on the attempted murder count are reversed and vacated; that count is remanded to the trial court where, at the discretion of the state, a new trial or further proceedings not inconsistent with this opinion may be had.

Affirmed in part; reversed and remanded in part.

DeBRULER and PRENTICE, JJ., concur.

PIVARNIK, J., concurs in part and dissents in part with opinion in which GIVAN, C.J., concurs.

PIVARNIK, Justice, concurring in part and dissenting in part.

Although I concur with the majority opinion wherein it affirms Defendant's con-

viction for class A felony robbery, I must dissent from the finding in issue I that there is no such crime as attempted felony murder.

Unfortunately, the majority seems to support its position abridging the felony murder rule on grounds that the logic and continued viability of the rule is questionable. In the first instance, I find no legitimate reason for this Court to take that position. The Legislature has provided that a person can be found guilty of felony murder if that person "kills another human being while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape or robbery." Ind.Code § 35–42–1–1(2) (Burns 1979). By enacting this statute, the Legislature clearly has stipulated Indiana's policy to be that any person causing death while committing certain inherently violent felonies that have the proven potential to cause death can be guilty of murder even though that person may not have acted with the specific intent to kill. If this policy is to be changed, it is within the Legislature's province to do so. It is not within the duties, powers and responsibilities of this Court to dictate the law according to our own personal judgments. We must determine what the criminal law is according to what the Legislature has enacted.

There should be no question that the Legislature intends that any person who attempts to commit a crime by taking a substantial step toward committing that crime is to be penalized in the same manner as if he had committed the crime itself. Ind. Code § 35–41–5–1(a) (Burns 1979) provides:

"A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony or misdemeanor of the same class as the crime attempted. However, an attempt to commit murder is a class A felony."

It requires a strained reading of the Legislature's language to hold that the Legislature intended for the felony murder rule to be valid when a death occurs but to be void when there is an attempt not resulting in death.

As the majority points out, the evidence in this case revealed that Defendant robbed the victim, told him to get on his knees and fired a gun at him thereby striking him with a bullet. The victim fortuitously survived. If the victim had died, Defendant clearly could have been charged and convicted of felony murder. Since the evidence shows that Defendant acted with the culpability required for the commission of felony murder and engaged in conduct constituting a substantial step toward its commission, an attempt was made to commit the crime of felony murder as proscribed by the Legislature. Accordingly, the trial court acted properly by allowing the charge to stand and by instructing the jury on attempted felony murder. In no way can it rightly be said that the Legislature intended otherwise. The Legislature has described the multitude of crimes subject to punishment in Indiana, including murder and felony murder. It also has proscribed attempts to commit any of these crimes without making any distinctions among them or without excepting any of them.

I would affirm the trial court in its conviction of Defendant for both class A felony robbery and for attempted felony murder.

GIVAN, C.J., concurs.