LEON SWOPE *v*. STATE OF INDIANA.

[No. 174S15. Filed April 4, 1975.]

*John G. Bunner,* of Evansville, for appellant.

*Theodore L. Sendak,* Attorney General, *Henry O. Sitler,* Deputy Attorney General, for appellee.

DeBRULER, J.—In a trial by jury, appellant, Leon Swope, was convicted of assault and battery with intent to kill, Ind. Code § 35-13-2-1, being Burns § 10-401a, and infliction of a physical injury with a deadly weapon in the course of a robbery, Ind. Code § 35-13-4-6, being Burns § 10-4101. He was sentenced to two to fourteen years on Count I and to life imprisonment on Count II. Appellant raises eight issues on appeal, all of which he presented in his motion to correct errors.

The facts most favorable to the State show that four or five men drove in appellant's car to the Radio Shack in Evansville about 10:00 to 10:30 a.m., November 20, 1972. Two of the men went in the store, and their actions alerted the manager to their probable intent to shoplift. He called the police and asked them to come to the store. He reported that their car was a white, 1966 or 1967 Plymouth Barracuda, license number 82 G 653. (Appellant's white, 1965 Plymouth Barracuda had license number 82 G 6653.) Between 10:00 and 11:00 a.m., two men came into the television and electronics department of Sears. The sales manager was concerned and reported their presence to the security guards. He identified appellant at trial as having been one of the two men in the store that morning.

At 12:05 p.m., appellant and two other men entered Tops and Bottoms, a clothing store located at Weinbach and Lincoln Avenues and managed by Charles Smith. All three went to different areas of the small store and looked around for five or ten minutes. Appellant left to get his billfold, and, after two or three minutes, the other two decided to leave. As they were leaving, appellant came back, and the three left together. At this point, Smith noticed that one of three expensive belts

was missing, so he went outside and tried to stop a policeman, but the policeman did not see him.

In ten minutes, the three returned and again went to various parts of the store. Appellant tried on a jacket and a couple pairs of pants, and all three looked around some more. Eventually, appellant brought two pairs of pants to the counter and asked Smith if he had a pair of bellbottom pants in size 32 extra long. Smith went to the back of the store to check, and appellant went with him. Smith knelt down to look on a bottom shelf. When he had satisfied himself that he did not have that size, he started to stand up but was pushed down. He got a glimpse of a knife, and then appellant stabbed him several times. Smith tried to get up and said, "Okay, that's enough," but appellant continued to stab him, so he lay still on the floor with his eyes closed. Appellant stabbed him fourteen times.

When the store became quiet, Smith got up and went to the window. He saw two of the men getting into a white Plymouth Barracuda, and appellant walking across the street toward the car. Smith telephoned the police, described the men and the car, and then fell down. He called for help. The woman who managed the dry cleaners next door came into the store and called the ambulance.

Police officers located a white Plymouth Barracuda at the corner of Gum and Evans, parked in front of appellant's parents' house. The officers were waiting in the police car for a further bulletin, when appellant came walking down Evans Street toward his car. They questioned appellant and took him into custody. He was dressed in blue denim pants, a pink shirt, and a white and red knitted hat.

At trial, Smith identified appellant as his assailant. Rick Fulmer, a customer of the dry cleaners next door to Smith store, also identified appellant at trial, as the man whom he saw leaving Smith's store at about the time of the crime.

## I.

Appellant objected to the prosecutor's expressing his personal opinion of appellant's guilt. The prosecutor remarked:

"We trust that you will do what is right. We, of course, are close to the situation and we're just so convinced this defendant is guilty. The evidence presented here is so convincing."

No lawyer should "assert his personal opinion . . . as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein." Code of Professional Responsibility, DR 7-106(C) (4). In other words, it is not improper for a lawyer to state his conclusion, as long as he does not imply that he has personal knowledge of an accused's guilt or innocence. Forbidden expressions of personal belief are "easily avoided by insisting that lawyers restrict themselves to statements which take the form, 'The evidence shows . . .' or some similar form." ABA Project on Standards for Criminal Justice, *Standards relating to the Prosecution Function and the Defense Function,* The Prosecution Function § 5.8(b), at 128 (1971).

The prosecutor's statement of opinion must be considered in the context of the argument as a whole. In this instance, the prosecutor had presented his version of all the evidence and immediately explained the reason that he was convinced appellant was guilty: "The evidence presented here is so convincing." This statement adequately explained the source of the prosecutor's opinion and dispelled the possibility of the jury's assuming superior knowledge from the statement, "We are close to the situation," which otherwise would have been fatally improper. See also, *Garrett* v. *State,* (1973) 157 Ind. App. 426, 300 N.E.2d 696; Annot., 50 A.L.R.2d 766 (1956).

## II.

Appellant asserts a denial of his right to a trial by a jury of his peers. Sixty-five prospective jurors were called by the court, five of whom were Negroes. The State exercised nine of its peremptory challenges and challenged all five of the Negroes. In consequence, no Negro served on the jury.

In *Swain* v. *Alabama*, (1965) 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, the United States Supreme Court held that the peremptory system, which permits challenges exercised "without a reason stated, without inquiry and without being subject to the court's control," might be used to excuse a person on the basis of his race, religion, nationality, occupation, or affiliations. 380 U.S. at 220. "The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." 380 U.S. at 219. Although Alabama had a system of struck juries, the *Swain* holding specifically included the peremptory challenge system also.

## III.

Appellant objected to Charles Smith's in-court identification of appellant as his assailant. In a hearing outside the presence of the jury, appellant argued that the in-court identification was tainted by an out-of-court show-up of appellant in the hospital twenty-four hours after the crime and before appellant had been taken before a magistrate for appointment of counsel. The State did not contend that this out-of-court identification was proper, but only that the in-court identification was based on Smith's observation at the time of the crime. The court overruled appellant's objection. (At a point later in the trial, without objection from appellant, Officer Overby testified to Smith's out-of-court identification.)

Smith's in-court identification was admissible if the State presented "clear and convincing" evidence of a basis for that identification independent of the hospital show-up. █ *U.S.* v. *Wade,* (1967) 388 U.S. 218, 240, 87 S.Ct. 1926, 18 L.Ed.2d 1149. Such evidence is required to assure the court that a witness' in-court identification of a defendant is not a product of a confrontation "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Stovall* v. *Denno,* (1967) 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199. In presenting "clear and convincing" evidence, the State should include information concerning:

> "the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup." *U.S.* v. *Wade,* 388 U.S. at 241.

This Court has noted further tests bearing directly on the opportunity of the witness to observe the person who committed the crime:

> "the length of time the witness was in the presence of the perpetrator, the distance of the witness from him, the lighting conditions at the time, capacity for observation by the witness, opportunity to observe particular characteristics of the criminal." *Dillard* v. *State,* (1971) 257 Ind. 282, 289, 274 N.E.2d 387.

In the present case, the trial court could have found that Smith's in-court identification was based on observations independent of the show-up. Smith testified that █ appellant was in his store on two separate occasions ten minutes apart, that he had helped appellant with

two or three items of clothing in the half hour before the stabbing, that he had been two to three feet from appellant several times, that he had watched all three men more closely after he discovered that a belt was missing, and that he had been able to see well because the store's lighting was excellent. When Smith telephoned the police about the crime, he described appellant as six feet, three inches or six feet, four inches, with a goatee and a mustache, wearing a long maxi coat. Appellant is six feet, four inches and had a goatee and a mustache at the time of the crime. About two hours before the show-up, Smith looked through a mugbook composed of fifty to one hundred photographs of Negro males. The book included a photograph of appellant taken July 13, 1969, at a time when appellant's beard and sideburns were less full. Smith was not able to identify any one of the men as his assailant. His failure to identify anyone has equivocal significance, since he did not identify anyone *else* before the show-up, but he also could not identify a photograph of appellant. As soon as he saw appellant in the hospital, Smith identified him. The show-up took place twenty-four hours after the crime. Obviously the presentation of a single suspect is inherently suggestive. This show-up was not *unnecessarily* suggestive. Smith was in critical condition and could not have attended a proper line-up. Compare *Stovall* v. *Denno, supra*. The trial court properly admitted Smith's in-court identification.

## IV.

Appellant objected to Rick Fulmer's in-court identification of appellant as the man whom he saw coming from Tops and Bottoms about ten minutes before the crime. In a hearing outside the presence of the jury, appellant argued that Fulmer's in-court identification was tainted by his out-of-court identification of appellant at a show-up at Tops and Bottoms. Fulmer testified that he first saw appellant from

the back when Fulmer stepped in the doorway of Tops and Bottoms to ask Smith if he had a certain style of slacks. A minute or two later, when Fulmer came out of the dry cleaners next door, he saw appellant walk along the sidewalk away from Tops and Bottoms, cut across the street, and get into his car. At the hearing on appellant's objection, Fulmer stated that his out-of-court identification occurred one hour after the crime, at 1:15 p.m. The court overruled appellant's objection.

Fulmer's identification was admissible if the State presented "clear and convincing" evidence that Fulmer's in-court identification was independent of the show-up. Testing the basis of Fulmer's in-court identification against the standards set out in *Wade,* we find that the trial court erred in overruling appellant's objection.

Fulmer had only a limited opportunity to observe appellant and had no reason for paying close attention to him. In a statement to the police on the day of the crime, Fulmer said that he had been able to see appellant's face only when he was "far off" and that he had not been able to make "any distinction at all." He testified that he could not say that the person who walked to his car was the same as the person he saw in the store, since he could not see the face of the person in the store. There is no evidence of a description of appellant made by Fulmer before the show-up. In his statement to the police after the show-up, he did not mention appellant's mustache and goatee as features which had helped him identify appellant. Fulmer had no opportunity to identify any other person before the show-up or to identify appelleant by another less suggestive means. At the time of the show-up, an hour had elapsed since Fulmer had seen appellant leaving the store. A show-up, being inherently suggestive, was unnecessary in this instance. Since Fulmer was not critically injured, there was no reason he could not have attended a

properly composed line-up. However, if the show-up took place only an hour after the crime, it may fit within the time parameter of *McPhearson* v. *State*, (1970) 253 Ind. 254, 253 N.E.2d 226. (Later in the trial, Officer Overby testified that the show-up took place two hours after the crime, and the record shows that the police located appellant's car, detained and questioned appellant, drove him to the hospital and to the Radio Shack, and then drove him to Tops and Bottoms.)

At trial Fulmer testified that he saw appellant as appellant was "walking straight at" him. Fulmer said that he saw appellant's face also as he drove past appellant who was sitting in his car. He testified that he had based his show-up identification on appellant's mustache and goatee, his stocking cap, his height of six feet, four inches and his being well built.

Officer Overby testified that Fulmer had not been able to identify appellant positively at the show-up. Fulmer testified that he had been able to identify appellant at that time. Fulmer's limited opportunity to observe appellant and his inconsistent descriptions of appellant will not support a finding that his in-court identification had an origin independent of the show-up.

Fulmer's identification was clearly relevant, and if the court finds that "there is a reasonable possibility that the evidence complained of might have contributed to the conviction," then the error cannot be harmless. *Chapman* v. *California*, (1967) 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705, quoting *Fahy* v. *Connecticut*, (1963) 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171. We find, however, that the error in admitting the in-court identification into evidence was harmless in this case. Smith's identification was positive. It was corroborated by the photographic identification by the Sears manager, by the fact that a car identical to appellant's was used in the crime, by the

fact that the clothing found by the policemen had been described by Smith and was appellant's 32 extra long size, and by Smith's immediate recognition of appellant at the show-up twenty-four hours after the crime. Fulmer's own testimony was limited in scope: appellant left Tops and Bottoms alone about 12:15 p.m. Fulmer's limited corroboration was so insignificant, that the admission of the in-court identification was harmless to appellant's case. *Schneble* v. *Florida,* (1972) 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340.

## V.

Appellant objected to the admission of certain items of evidence which the police found in his car when they searched it pursuant to a valid search warrant forty-eight hours after they had had it towed to the Dallas Wrecking Company lot. Appellant argues that, when the State did not present evidence of the security measures taken in this privately-owned lot, the State failed to show a chain of custody which would preclude the opportunity for tampering. In the hearing on appellant's objection, there was evidence that the gate in the fence which surrounded the lot was often open during the day and that the general public could come inside. The door on the passenger side of the car was unlocked. The policeman who searched the car found two pairs of slacks under the driver's side of the front seat and a jacket under the passenger's side of the front seat and two knives in the glove compartment.

At trial, in a hearing outside the presence of the jury, the prosecutor and appellant's counsel presented arguments emphasizing the legality of the search and challenging the chain of custody. The search was legal. The items found in the search were admissible. However, the State cannot compare this search to a search of items not in police custody, and appellant's chain of custody argument is relevant here. Appellant has a right to require

that the State show the connection between appellant's car at the time he surrendered it to the police and the items found inside it. Since the State did not present evidence to negate the possibility of the items being placed there by someone after the car was impounded, it was error for the court to admit into evidence testimony that the items were found in the car.

The weakness in the chain of custody would not exclude the clothes from evidence. Smith's testimony laid a foundation for their admission. The jacket and two pairs of slacks adequately matched Smith's description of the clothes Smith said that appellant had selected. The jacket and one pair of slacks had Tops and Bottoms labels on them, marked with the identification of the Evansville store. Smith said that he had no knowledge of what happened to the slacks and jacket which appellant had placed on the counter. He had never sold a jacket of the type found by the police, and he had worked alone in Tops and Bottoms during the six to seven months before the police found it. The clothes were admissible as evidence of a robbery, but the officers could testify only that they had found them outside the store forty-eight hours after the crime.

This error in admitting evidence that the clothes were found in appellant's car was harmless. Witnesses testified that appellant's car was at the scene of the attempt to shoplift at the Radio Shack, that the three men who left Tops and Bottoms shortly before Smith was discovered stabbed got into a car of that description, that Smith saw two of the men getting into a car of that description and appellant crossing the street toward it. Appellant presented no alibi for his car during those hours. He testified that he had parked his car and gone to buy some wine early in the morning. When he returned, the car was gone. Appellant does not contend that his car was not used in the crime. The fact that the clothing was found in the car

does not connect it with appellant, when he contends that he had no control over the vehicle.

## VI.

Colored slides showed the interior of Tops and Bottoms from various angles. Appellant does not argue that they were inadmissible. He does object to the State's showing the slides during the testimony of three different witnesses.

There is no reason that admissible slides may not be viewed by the jury several times, if on each occasion, the slides are relevant to the witness' testimony. Historically, photographs were admissible only as graphic portrayals of oral testimony. McCORMICK, EVIDENCE, § 214 (2d Ed. 1972). Three witnesses, Charles Smith, who described appellant's acts prior to and during the stabbing, the policeman who described the scene of the crime when he arrived, and the policeman who took the slides, tested samples of the blood, and explained the store's dimensions were each aided by the slides.

## VII.

On cross-examination of appellant, the prosecutor asked him if he were employed at the time of his arrest, and appellant replied affirmatively. The prosecutor then asked him if it were true that he had told the court that he did not have a job and could not employ an attorney. Appellant replied that, at that time, he did not have a job because he was in jail. At that point, counsel for appellant moved for a withdrawal of the case from the jury on the grounds that the facts of the lawyer-client relationship and the implication that his client had lied to the court at the time counsel was appointed were matters which the jury should not hear. In a hearing outside the presence of the jury, the prosecutor replied that he had the right to impeach appellant by showing

that he had made prior inconsistent statements and that the question was intended only to reveal the inconsistency.

The trial court had observed the conduct of the prosecutor in court. From the record, we also can determine that the prosecutor's question is not one of a series of intentional innuendoes. Furthermore, we are not at all certain that it was detrimental to appellant's case for the jury to know that appellant was unemployed or was unable to hire a private attorney, so that the court had appointed the attorney who was representing him. It was not error for the trial court to overrule appellant's motion to withdraw the submission of the cause to the jury.

## VIII.

Appellant argues that there is insufficient evidence of a robbery. A robbery is defined in Burns § 10-4101, *supra*:

> "Whoever takes from the person of another any article of value by violence or by putting in fear, is guilty of robbery. . . ."

On cross-examination, Smith testified that appellant had not taken any of the money that was in the cash register, or Smith's watch or the money in his billfold or pocket. Nor had appellant ever asked Smith to give his money to appellant.

A person accused of robbery must have taken something of value but not necessarily money. If the State proved that appellant and his accomplices took clothing from Smith, as was alleged in the indictment, that taking was clearly a robbery. Smith testified that appellant had selected and put on the counter the three items of clothing which the police later found. Two of the items had Evansville Tops and Bottoms tags on them. The woman who worked in the dry cleaners next door testified that when the three men were walking across the street, clothes, including a blue jacket with a gray collar, were falling out from under the coat of one of the men. A jacket of this

description was one of the three items found. It had an Evansville Tops and Bottoms tag on it, and Smith testified that no jacket like it had been sold in the previous six or seven months.

As the agent of Tops and Bottoms, Incorporated, Smith was in lawful possession of the clothes. *Jackson* v. *State,* (1971) 257 Ind. 477, 275 N.E.2d 538. Secondly, the State did not have to prove that appellant was the man who carried the clothes out under his coat, as long as the State proved that appellant was one of the three men who acted together to rob Smith. *Cline* v. *State,* (1969) 253 Ind. 264, 252 N.E.2d 793.

The evidence of a robbery of clothing was sufficient. The court properly overruled appellant's motions for judgment on the evidence at the conclusion of the State's evidence and at the conclusion of all the evidence.

The judgment of the trial court is affirmed.

Givan, C.J., Arterburn, Hunter and Prentice, JJ., concur.

NOTE.—Reported at 325 N.E.2d 193.