**Martin D. MURRAY, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 182S36.

Supreme Court of Indiana.

Dec. 14, 1982.

John D. Boren, Boren & Oliver, Martinsville, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant, Martin D. Murray, was convicted of Murder, Ind.Code § 35–42–1–1 (Burns Repl.1979), Burglary, Ind. Code § 35–43–2–1 (Burns Repl.1979), and Theft, Ind.Code § 35–43–4–2(a) (Burns Supp.1982), at the conclusion of a jury trial in the Morgan Superior Court on May 16, 1981. Defendant was sentenced to sixty (60) years for murder, twenty (20) years for burglary, and four (4) years for theft, all sentences to be served consecutively. He now appeals.

Defendant Murray raises four issues on appeal concerning: 1) whether the trial court erred in failing to dismiss the action because of alleged violations of the discovery order; 2) whether the trial court erred in overruling the Motion to Correct Errors in regard to alleged prosecutorial misconduct; 3) whether defendant was denied adequate assistance of counsel; and, 4) whether the trial court erred in giving Instruction No. 8.

The record reveals that Harry D. Mowrey was found dead in his home about noon on October 15, 1980. Mowrey's vehicle was missing and the glass had been broken out of the kitchen door of his home. The telephone wires in the home had been cut and it was later determined that a collection of old coins was missing. A hammer, which had traces of human blood on it, was found in the victim's kitchen. It was the pathologist's opinion, after having performed an autopsy, that the head wounds which caused the victim's death had probably been inflicted with a hammer. During the evening of October 14, 1980, defendant Murray was in the company of two of his friends, Greg Maddle and Jeff Piersall, and had a .22 caliber gun in his possession at that time. Defendant indicated to these two friends that he was going to Mooresville to rob "some place." Prior to this time, Defendant had asked his brother, William Charles Murray, III, who had formerly lived in the upstairs apartment of the victim's house, about the possibility of burglarizing the victim's house in Mooresville. On October 14, Defendant broke into the victim's house, was surprised by the victim's presence and mortally wounded him by striking him in the head with a hammer and then stole old coins from the house. Around midnight on the same night, Defendant stopped in Indianapolis at the residence of his aunt, Patricia Whitaker, and told her that he had a hat, some money, and a car, and he was leaving. The victim's automobile was found burning near a Florida highway and Defendant and a hitchhiker were apprehended near the vehicle by the Florida State Police. The hitchhiker told police that the defendant had driven erratically, at high speed, and had nervously checked the road behind him. Defendant had stopped in Tipton, Georgia, to sell old coins to pay for gasoline. He had told the hitchhiker that he might be wanted for murder for hitting an old man with a hammer. The coin dealer was able to give a description of Defendant and the hitchhiker but was un-

able to pick out Defendant from a photographic lineup. A jail-mate of Defendant in the Morgan County Jail testified that Defendant told him a story very similar to the one which Defendant had told the hitch-hiker.

I

Defendant contends there were eight instances where the State failed to provide evidence to the defendant pursuant to discovery orders, the cumulative effect of which denied Defendant a fair trial. The conduct of discovery, of course, is within the discretion of the trial court and the trial court has wide discretionary latitude in discovery matters as a part of its inherent power to guide and control the proceedings. *Spears v. State,* (1980) Ind., 401 N.E.2d 331, 339; *Johns v. State,* (1968) 251 Ind. 172, 179, 240 N.E.2d 60, 64. The trial court's discovery order here was phrased in general terms. The prosecutor's duty to disclose is measured by whether the evidence in his possession is so "obviously exculpatory" that failure to turn it over denied Defendant a fair trial. *United States v. Agurs,* (1976) 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342, 351; *Richard v. State,* (1978) 209 Ind. 607, 614, 382 N.E.2d 899, 904, *cert. denied,* 440 U.S. 965, 99 S.Ct. 1515, 59 L.Ed.2d 781. All parties agreed that several instances of late discovery occurred at the trial. There was explanation for these late revelations since in some cases, the evidence was not available until that time. The court found in several instances which the defense counsel agreed to, that there was no purposeful and deliberate failure or refusal of the State to come forward with discoverable items. Furthermore, if properly discoverable evidence is revealed for the first time at trial, the defendant has two remedies: one, to move for a continuance, or two, to move for exclusion of the evidence. *Reid v. State,* (1978) 267 Ind. 555, 372 N.E.2d 1149. The evidence is excludable when the trial court finds that the State has blatantly and deliberately refused to comply with the court's discovery order. *Sparks v. State,* (1979) Ind., 393 N.E.2d 151, 153; *Reid, supra; Johnson v. State,* (1979)

Ind.App., 384 N.E.2d 1035, 1038. The imposition of sanctions for failure to comply with discovery orders are discretionary and not mandatory. *Rowley v. State,* (1979) Ind., 394 N.E.2d 928, 930; *Popplewell v. State,* (1978) 269 Ind. 323, 327–28, 381 N.E.2d 79, 82. Absent clear error the trial court's determination on violations and sanctions should not be overturned. *Reid, supra.* Every error of the trial court does not require that the case be reversed; only when error has caused prejudice to Defendant is there cause to reverse. *Smith v. State,* (1982) Ind., 432 N.E.2d 1363, 1368.

Defendant points to error in the evidence introduced at trial through the testimony of Ed Charters, the Indiana State Police laboratory technician, who processed the scene of the crime. Charters' testimony revealed that a fingerprint found on a piece of broken glass from the victim's kitchen door did not match either the defendant's or the victim's prints. He further testified that he had misplaced the fingerprint information within his file and had relocated it only a week before the trial and notified the deputy prosecutor of its existence on the day of his testimony. The court ruled that there being no evidence of bad faith, the defense motion to dismiss should be denied because there was no showing that the item had been deliberately withheld by the State and no showing that Defendant had been prejudiced to the extent that required dismissal of the charges.

During the cross-examination testimony of the Chief Deputy of Mooresville, Marshall Ditton, both the deputy prosecutor and defense counsel first learned of the possibility that State's witness, William Charles Murray, III, had given a second statement to police. Both then moved for a continuance in order to locate the tape and defense also moved to dismiss. The tape was located and transcribed and witness Ditton was later recalled so that defense counsel could again cross-examine him about the contents of the second tape. Again there was no showing of deliberate bad faith on the part of the deputy prosecu-

tor nor any showing of prejudice to the defendant in regard to this exhibit or in cross-examination of the witness regarding it.

■ Defendant next alleges that the State did not disclose the existence of autopsy photographs taken by Ed Charters and Dr. Harley Palmer, pathologist. Defense counsel admitted to having seen the autopsy photographs and, further, did not object to the admission of the photographs at trial. This constitutes a waiver on appeal, preserving nothing for review. *Suggs v. State,* Ind., 428 N.E.2d 226, 229; *McCraney v. State,* (1981) Ind., 425 N.E.2d 151, 153; *Stubblefield v. State,* (1979) Ind., 386 N.E.2d 665, 667.

■ Defendant next alleges the State failed to disclose to the defense that Jim Burt, of Tipton, Georgia, the coin dealer who purchased the stolen coins from Defendant, could not pick Defendant out of a photographic lineup. Mr. Burt was able to describe Defendant but could not absolutely identify him. The evidence did come up in the trial and defense counsel learned of it the day before cross-examination of the witness. Defense did not move for a continuance nor did he move to exclude the evidence. *Reid, supra.*

■ William Kuhn, forensic serologist with the Indiana State Police, testified to the results of a blood grouping test. Neither defense counsel nor deputy prosecutor Craney had written results of the test since it had been run only six days before trial. Both defense counsel and the prosecutor, however, were aware of the results and the witness obtained copies of the written report for the parties before resuming his testimony. Again defense counsel did not move for a continuance or to exclude this evidence; in addition, defense counsel has failed to establish any prejudice or intentional bad faith by the State.

■ Defendant alleges error on grounds the State did not disclose the names of two young women, Cindy Silas Simpson and Janice Finchum, to the defense. It appears these two persons were known to police officers during their investigation but they were determined by police to be "dry" leads as they produced no probative evidence. The prosecutor indicated, however, that the name of Simpson was disclosed on the State's discovery compliance filed on April 15, 1981. Since the lead had not turned up information the State considered probative, neither of the witnesses was called by the State at trial. The State contended it did furnish the name of Simpson and felt the disclosure of Finchum was not necessary since it was nothing more than police investigatory notes and could not be considered exculpatory evidence since there was no probative evidence from that witness at all. The State refers us to *Agurs, supra,* in which the United States Supreme Court held that the "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." 427 U.S. at 109–110, 96 S.Ct. at 2400, 49 L.Ed.2d at 353. *See also Birkla v. State,* (1975) 263 Ind. 37, 323 N.E.2d 645, *cert. denied,* 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77; *Dillard v. State,* (1971) 257 Ind. 282, 274 N.E.2d 387.

■ Defendant further alleges that the State promised to call one Chuck Pierson as a witness but then did not call him. Pierson was a participant in a fight near the residence of Pat Whitaker, the Defendant's aunt, at whose residence Defendant had been seen late in the evening on the date of the murder. It is Defendant's position that there was some evidence that a person covered with blood was at Whitaker's that night. Presumably this blood came from the fight that took place at the scene but Defendant claims that William Charles Murray, III, the brother of Defendant, was also at that residence that night and Defendant seems to feel that William Charles Murray is a suspect in this crime. The State points out, however, that defense counsel Boren had already known about that fight and several other witnesses had testified to the occurrences of that night and several witnesses had identified the

participants in the fight. The State did not feel, therefore, that the calling of Pierson would be pertinent or necessary. The trial court's appraisal of the situation was as follows:

"[N]ow it would appear that once again it's just a person who was there as part of the fight and that the that the (sic) evidence to be offered is no more than that. If that's true, then one cannot characterize it as exculpatory evidence and in light of the fact that defendant has had an opportunity to take depositions and has taken depositions of participants who were there . . . to say from what's before the Court at this time that the defendant has been denied a fair trial, I don't feel is supported by either the evidence or the argument."

We agree with the trial court.

 The State points out that the record is replete with references by the court and by defense counsel to the good faith attempts by the prosecution to comply with the discovery order. The State shows that after filing its original response to discovery, it filed eight supplemental responses to discovery in an attempt to comply with its discovery obligations. At one point deputy prosecutor Craney offered to open the State's evidence books to the defendant to insure that no other evidence was unknown to the defense. The court found that no evidence of bad faith existed on the part of the State in any of the problems with discovery and there is no showing by defense that such was the case. We do not find the trial court abused its discretion in this area in any manner justifying reversal.

## II

Defendant claims over five separate instances of prosecutorial misconduct that would show that if not singly, but taken together, would place Defendant in such grave peril that he could not receive a fair trial.

 Defendant admits the standard for determining the significance of prosecutorial misconduct was set out in *Maldonado v. State,* (1976) 265 Ind. 492, 498, 355 N.E.2d 843, 848. First, the court must determine that the prosecutor did, in fact, engage in misconduct as defined by the case law of the jurisdiction, the disciplinary rules, and the code of professional responsibility. In this regard, *see Swope v. State,* (1975) 263 Ind. 148, 325 N.E.2d 193, *cert. denied,* 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100. Second, the court must determine if, when viewed from the totality of the circumstances of the case, misconduct placed the defendant in a position of grave peril to which he should not have been subjected. *White v. State,* (1971) 257 Ind. 64, 272 N.E.2d 312. Third, in determining whether or not the defendant was subjected to grave peril by the misconduct of the prosecutor, the court will look to the probable persuasive effect of the misconduct on the jury's decision, not to the degree of impropriety of the conduct. *Swope, supra.* Finally, though an isolated instance of misconduct may not establish grave peril, if repeated instances evidence a deliberate attempt to improperly prejudice the defendant, a reversal may result. *Robinson v. State,* (1973) 260 Ind. 517, 297 N.E.2d 409.

 The first instance cited by Defendant did not take place before the jury and, in fact, did not take place before the court. It was during the taking of a deposition of William Charles Murray, III, a State's witness being deposed by the defendant. The record of the deposition shows that the witness had asked whether he was going to be charged with anything and whether he needed a lawyer. This type of discussion continued through several pages of the deposition in which the witness repeatedly asked these questions. The record shows Deputy Prosecutor Craney stated to the witness he should not worry about it if he did not commit the murder. At a recess, Deputy Prosecutor Craney advised the witness that the defense strategy would include implicating the witness. As stated above, it was one of the theories of the defense that this witness was a suspect and apparently defense strategy was geared to presenting this fact to the jury. When they returned to the record for more questions,

the witness continued to refuse to testify and stated his unwillingness to talk before the recess was due to advice given to him by a policeman at Mooresville and a woman named Janice Murray. It is now Defendant's charge that Deputy Prosecutor Craney had tampered with the witness by trying to influence his testimony. It appears Deputy Prosecutor Craney's point is well taken as expressed in the State's response to the motion to correct errors that the prosecution would be remiss if it did not discuss the theories of the defense with its own witnesses. It certainly does not appear that it was improper for Craney to advise the witness, particularly when he was asking about his rights, that there was an intent to pin this crime on him and he ought to be aware of it in testifying. In any event, it is not shown here that the defendant was in any way prevented from having any testimony this witness had to offer. Therefore, there is no prejudice shown to Defendant and this event does not show deliberate misconduct by the prosecutor and certainly does not show that the defendant was placed in grave peril. The jury was not even aware of this encounter and could not have used it in arriving at its verdict. Furthermore, as stated above, it does not appear it prevented Defendant from obtaining any facts or evidence required for a full and proper defense.

 The next instance pointed out by Defendant involves an attempt by the deputy prosecutor to question Officer George Ditton regarding a conversation Ditton had with the defendant in Florida. The defendant objected to this on the grounds that the court had previously granted a motion *in limine* as to the details of the entire occurrence in Florida. The court reminded the deputy prosecutor of this and sustained the objection. The court then indicated it found no bad faith on the part of Prosecutor Craney because Craney was in Florida working on this case at the time of the motion *in limine* and may not have been particularly aware of it. The court then overruled Defendant's motion for mistrial. The trial court found this to be an inadvertent mistake by the prosecutor and did sus-

tain the objection to the question. The trial court did not find this to place the defendant in such grave peril that mistrial was warranted. We agree with the trial court. We fail to see how this incident could have had such impact on the jury that it placed Defendant in grave peril from which he could not extricate himself.

 The third incident happened outside the presence of the jury. The State was proposing to call witness O'Neil and both parties wished to question O'Neil before putting him on the stand. Defense counsel had already been provided a copy of O'Neil's statement to police earlier on that day. Defendant requested the right to question O'Neil before Prosecutor Craney did so. It was Craney's position that she had a right to question her own witness before having defense counsel question him. They presented this issue to the court and the trial judge ordered the prosecutor to permit the defendant to interview O'Neil before the prosecutor herself interviewed him. We see no merit whatever in Defendant's contention that this was an attempt by the prosecutor to obstruct justice by preventing Defendant from contacting the witness. Whatever prejudice Defendant may have felt he occasioned by not having "first crack" at the witness, was cured by the trial court's ordering the prosecutor to permit the defendant to interview O'Neil first. This was done and Defendant did, in fact, interview the witness first. There is, therefore, no merit to Defendant's contention that he was prejudiced by this incident.

 During the trial, the State sought to add some probation officers as additional witnesses. It appears the State felt the need to subpoena these witnesses because after depositions of Peggy and Michael O'Neil were taken, it appeared defense counsel might attempt to impeach Michael O'Neil as a State witness by showing probation violations. The prosecutor apparently felt these witnesses might be needed to respond to those allegations. Defendant's interpretation of the prosecutor's actions is that the prosecutor subjected Miss Baker,

the probation officer, to the imposition of a subpoena for the simple reason that she wanted to know if this witness was providing information to defense counsel. In other words, it represented a veiled threat to any potential witnesses that if they spoke with defense counsel they would be subpoenaed to court. There is no showing that the prosecutor in any way attempted to encourage or prevent this witness from communicating with the defense. The record is not clear whether or not this witness was ever called to testify and, as stated above, the entire encounter took place outside the presence and knowledge of the jury. There is no showing by the defense that the incident, whatever its intent, had any actual effect on the defendant's case or in any way significantly prejudiced him in his defense.

 Finally, Defendant alleges the deputy prosecutor prejudiced the defendant by her comment before the jury that the defense had listed ten witnesses and called only four. The context of the statement appears from the record to be a statement to the court that the prosecutor was not ready to go ahead with rebuttal since she was surprised that the defense had rested much earlier than anticipated. The defense completed its fourth witness and then rested. The court then asked Mrs. Craney if she had any rebuttal to offer. Mrs. Craney responded to the court, "I believe there may be some rebuttal, Your Honor. Mr. Boren called approximately four witnesses out of the list of over ten persons." The defendant objected to the statement, stating it had nothing to do with the situation, and the court then again asked Mrs. Craney if she had any rebuttal. She stated she would need a little time to examine her position before she could be prepared to give rebuttal evidence. The court then advised the jury that they would recess for a time so that he could consult with counsel and map out a plan to finish the cause. The court indicated to the jury that the case seemed to be closing much sooner than was anticipated and he would have to talk to counsel about what might be expected. He told them that rebuttal usually has only one or two witnesses and that he presumed the

case would end very soon and would be submitted to them.

It does not appear in the context of this conversation that it was the intention of the prosecutor to ridicule the defense for calling only four of ten witnesses. Rather, as illustrated above, it was an explanation as to why the prosecutor was not ready to go forward immediately with rebuttal. At any rate, it does not appear the statement was so prejudicial as to place the defendant in grave peril. Defendant raised one other issue regarding reference by the State to a polygraph test and a mention of the Stephen Judy case but has waived those issues by failing to present any arguments in its brief. Rule A.P. 8.3(a)(7). Any error alleged in the motion to correct errors and not briefed is deemed waived.

 None of these events of prosecutorial misconduct, taken individually or together, illustrate a deliberate attempt to improperly prejudice the defendant nor do they show such prejudice that the defendant was placed in such grave peril that the jury's verdict of guilty could be deemed to have been influenced by them.

### III

Defendant raises the novel issue of inadequate assistance of counsel, claiming that defense counsel was prevented from adequately assisting Defendant by reason of the errors of the court raised in the first two issues above, namely allowing the State to violate the discovery orders and permitting the prosecutorial misconduct. Defendant claims that the specific instances of non-compliance with the court's orders by the State, along with the court's failure to administer sanctions, indicates the inability or unwillingness of the court to properly support defense counsel as an officer of the court. He then goes on to provide that because of this failure of the trial court, defense counsel was ineffective and he did not receive a fair trial. Since we have found the court did not commit reversible error concerning the issues alleging the violation of the discovery orders or the alleged

misconduct of the prosecuting attorney, then Defendant's argument must fail on this issue for the same reasons. Further, there is no allegation nor showing that the efforts of defense counsel here were so ineffective or inadequate that a "mockery of justice" occurred. *Smith v. State,* (1979) Ind., 396 N.E.2d 898. In fact, the same counsel that represented the defendant at trial is representing him upon appeal. The record clearly reveals, as illustrated by incidents pointed out in this opinion, that defense counsel was alert and did an adequate job of representing this defendant. The trial court commented many times on the quality of the defense and in the ruling on the motions for mistrial made the statement: "If, indeed, this defendant has been denied ineffective (sic) assistance of counsel at this point for the reasons stated or for any other reason applicable to this case, then in my twenty-three years in the criminal justice system, I have not seen a case yet that cannot be reversed on ineffectiveness of counsel." We see no merit to Defendant's contentions on this issue.

### IV

 Finally, Defendant assigns error in the giving of State's instruction No. 3, which reads:

"If a defendant is innocent, he should not be convicted erroneously; but if a defendant is guilty, he should not be acquitted erroneously. By acquittal of the guilty a contempt of the law is aroused among the criminal classes and the safeguards of society are weakened."

This was given as court's final instruction No. 8. Defendant has no quarrel with the first sentence of this instruction but claims the second sentence was improper as there was no evidence that contempt of the law would result from the jury making a mistake in this verdict. This instruction has been approved numerous times by this court, either given as a separate instruction as it was here or part of a larger instruction. *Pointon v. State,* (1980) Ind., 408 N.E.2d 1255; *Holliday v. State,* (1970) 254 Ind. 85, 257 N.E.2d 679; *Sankey v. State,* (1973) 157 Ind. 627, 301 N.E.2d 235. In *Holliday, supra,* this Court cited *Pritchard v. State,* (1967) 248 Ind. 566, 230 N.E.2d 416, reasoning: "It should be readily noted upon a reading of said instruction that it is only a guideline, general in nature, which provides criteria for the jury in its approach to its serious duties in the trial of a criminal case." 254 Ind. at 90–91, 257 N.E.2d at 682. Immediately prior to this instruction, the trial court gave a detailed and proper instruction on presumption of innocence of the defendant and immediately following it gave a lengthy and proper instruction on the standard of proof beyond a reasonable doubt. The court further instructed the jury that instructions are not to be considered separately but rather as a whole. We accordingly find no error on this issue.

The trial court is in all things affirmed.

GIVAN, C.J., and DeBRULER and PRENTICE, JJ., concur.

HUNTER, J., concurs in result.