**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MICHELLE F. KRAUS**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JOSEPH Y. HO**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DEANTOINE M. HARRIS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A03-1204-CR-185 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Frances C. Gull, Judge
Cause No. 02D06-1201-FB-3

**January 14, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

At approximately 4:00 p.m. on December 28, 2011, Jamie Acosta arrived at a residence to deliver a pizza. Upon arriving at the home, Acosta was met by a tall African-American man. The man invited Acosta inside. Acosta decline the invitation. Moments later, the tall man and a shorter African-American man charged at Acosta and tried to pull him into the home. Acosta resisted. The shorter man pointed a gun in Acosta's face. As Acosta attempted to retreat, the shorter man kept the gun pointed in Acosta's face and demanded money. Acosta focused on the shorter man's eyes. Acosta threw the money that he had in his pocket at the shorter man who caught it, all while keeping the gun pointed in Acosta's face and demanding more money. Both men rummaged through Acosta's vehicle, looking for more money, before retreating to a nearby residence. The shorter man was subsequently identified as Deantoine Harris.

On January 14, 2012, the State charged Harris with Class B felony robbery. The State subsequently amended the charging information to include the allegation that Harris was a habitual offender. At trial, Acosta identified Harris as the individual who had robbed him at gunpoint. Following trial, the jury found Harris guilty of Class B felony robbery and determined that Harris was a habitual offender. The trial court sentenced Harris to an aggregate thirty-year sentence. On appeal, Harris contends that the trial court erred in admitting Acosta's in-court identification of Harris as the individual who robbed him at gunpoint. Concluding that the trial court did not err in admitting Acosta's in-court identification of Harris, we affirm.

**FACTS AND PROCEDURAL HISTORY**

On December 28, 2011, Harris resided at 6217 Downingtown Drive in Fort Wayne. At approximately 4:00 p.m., Jamie Acosta was working as a pizza delivery man for Pizza Hut when he made a delivery to 6232 Downingtown Drive. Acosta was carrying approximately $30 to $40 in cash with him at the time of the delivery. Upon arriving at 6232 Downingtown Drive, Acosta was met at the door by a tall African-American man wearing dark clothing. The man invited Acosta inside the home, which Acosta noticed was empty. Acosta declined the invitation. Acosta and the tall man had a brief conversation about the home being empty before the man turned and walked into what appeared to be the kitchen.

Suddenly, the tall man and a shorter African-American man came charging toward Acosta and told him to "get inside the f-ing … house." Tr. p. 70. The shorter man was wearing a loose dark "hoodie" over other clothing and was holding a semi-automatic handgun. Tr. p. 69. The shorter man held the gun "straight out" and pointed it in Acosta's face. Tr. p. 81. The handgun had a black handle and a silver muzzle. Acosta dropped the pizzas and cheesecakes he was at the home to deliver as the two men attempted to pull him into the home. While struggling with the two men, Acosta kept his eyes on the handgun and the shorter man's eyes.

Eventually, Acosta freed himself and began to back away. As Acosta backed away, the shorter man stood up, pointed the gun in Acosta's face, and demanded money. Acosta continued to look at the eyes of the shorter man, who was standing about two feet away, as he backed away. Acosta threw the money he had in his pocket at the shorter man, who caught it without lowering the gun from Acosta's face. The shorter man continued to hold the gun in

3

Acosta's face while demanding more money. Acosta continued to back away and kept his eyes on the shorter man's eyes and the handgun. The men searched Acosta's vehicle, looking for more money, and took a pair of binoculars before walking away. Acosta watched the men walk in between the two houses located at 6223 and 6217 Downingtown Drive before calling the police.

When the police arrived, they began looking for the men in the direction indicated by Acosta. The police observed fresh footprints in the snow that entered, but did not leave, the home located at 6217 Downingtown Drive. The responding officers did not observe any one enter or leave the home or walking down Downingtown Drive upon their arrival. A canine unit arrived approximately ten to twelve minutes after Acosta notified police of the robbery, and tracked the robbers to 6217 Downingtown Drive. Police instructed the men inside 6217 Downingtown Drive to exit the home. When the men emerged with their hands in their air, they were surrounded by officers, some of whom had weapons drawn. The men were taken to the ground and placed in handcuffs.

Acosta was still at the scene of the robbery when he saw police apprehend the two men. Upon seeing the arrest of the two potential perpetrators, Acosta commented to his boss, who had arrived at the scene and was standing next to him, that "look, they already got the two guys." Tr. p. 123. After apprehending the two men, police asked Acosta if he could identify the men as those who robbed him. Acosta immediately identified the taller man as the taller perpetrator based on his height, look, and demeanor. Acosta told officers that both men had changed clothes in the nearly thirty minutes since the robbery had taken place.

4

With respect to the shorter man, Acosta requested an opportunity to get closer to the man before identifying him as the individual who had pointed the gun in his face. Acosta stated that he wanted to look the shorter man in the eyes before identifying him as the perpetrator because he could not "forget the eyes." Tr. p. 117. The officers complied with Acosta's request, after which he identified the shorter man as the individual who had robbed him at gunpoint.

The taller man was subsequently identified as Michael Eldridge. The shorter man was subsequently identified as Harris. Upon searching Harris's home, police recovered a handgun that had a black handle and a silver muzzle, a pair of binoculars matching the ones taken from Acosta's vehicle, and a black hooded sweatshirt matching the description of Harris's clothing given by Acosta. Police subsequently found Harris's identification card and $34 in cash, consisting mostly of $1 bills, in the pocket of the black hooded sweatshirt.

On January 4, 2012, the State charged Harris with Count I, Class B felony robbery.[1] On February 3, 2012, the State amended the charging information to include Count II, which alleged that Harris was a habitual offender. A two-day trial was commenced on February 28, 2012. Prior to the beginning of trial, Harris entered the court room wearing jail attire. Acosta was present in the court room when Harris entered in jail attire and could potentially have seen Harris wearing the jail attire. During trial, Acosta identified Harris as the individual who had robbed him at gunpoint. Acosta testified that he requested the opportunity to get a closer look at Harris before identifying him as the perpetrator because he

---

[1] Ind. Code § 35-42-5-1 (2011).

5

did not want to make a false identification and "was afraid [he] was going to make a mistake so … [he] wanted to [be] a hundred percent sure that that was the man." Tr. p. 118. Acosta further testified that after looking Harris in the eyes, he was "a hundred percent" sure that Harris was the man who had robbed him at gunpoint. Tr. p. 118.

At the conclusion of trial, the jury found Harris guilty of Class B felony robbery. The jury also determined that Harris was a habitual offender. On March 28, 2012, the trial court sentenced Harris to an aggregate term of thirty years of incarceration. This appeal follows.

## DISCUSSION AND DECISION

### I. Whether the Trial Court Erred in Admitting Acosta's In-Court Identification of the Defendant

Harris contends that the trial court erred in admitting Acosta's in-court identification of Harris as the man who robbed him at gunpoint. In making this contention, Harris argues that the in-court identification was tainted because the procedure employed by police during the pre-trial "show-up" identification of Harris by Acosta was unduly suggestive. Harris also argues that the in-court identification was tainted because Acosta allegedly saw Harris wearing jail attire in the court room prior to trial.

### A. Pre-Trial "Show-Up" Identification

In arguing that Acosta's in-court identification was tainted by the pre-trial "show-up" identification, Harris argues that the procedure employed by police during the pre-trial "show-up" identification was unduly suggestive and, as a result, violated his due process rights under the Fourteenth Amendment of the United States Constitution. "A show-up

procedure may be so unnecessarily suggestive and so conducive to irreparable mistake as to constitute a violation of due process of law under the Fourteenth Amendment." *Hubbell v. State*, 754 N.E.2d 884, 892 (Ind. 2001). However, in *Hubbell*, the Indiana Supreme Court adopted the United States Supreme Court's rejection of a per se rule of exclusion of pre-trial identification evidence involving suggestive or unnecessary procedures. 754 N.E.2d at 892 (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-14 (1977)). Instead, the Indiana Supreme Court held that due process permits the admission of such evidence if, under the totality of the circumstances, the identification is reliable. *Id*.

Review of a challenge regarding the admission of evidence relating to a pre-trial identification involves a two-step analysis. *Id*. (citing *Slaton v. State*, 510 N.E.2d 1343, 1348 (Ind. 1987)). "The first question is whether the initial identification procedure was unnecessarily or impermissibly suggestive." *Id*. (citing *Slaton*, 510 N.E.2d at 1348). "The second inquiry is whether, under the totality of the circumstances, the identification was reliable even though the procedure was suggestive. *Id*. (citing *Slaton*, 510 N.E.2d at 1348). This review of the totality of the circumstances includes:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Lyles v. State*, 834 N.E.2d 1035, 1044-45 (Ind. Ct. App. 2005), *trans. denied* (citing *Adkins v. State*, 703 N.E.2d 182, 186 (Ind. Ct. App. 1998)). "'Identifications of a freshly apprehended suspect have been held to be not unnecessarily suggestive despite the suggestive factors

7

unavoidably involved in such confrontations because of the value of the witness's observation of the suspect while the image of the offender is fresh in his mind.'" *Id*. at 1045 (quoting *Lewis v. State*, 554 N.E.2d 1133, 1135 (Ind. 1990)).

Harris claims that Acosta's in-court identification of him as the man who robbed Acosta at gunpoint was tainted and should not have been admitted at trial because the pre-trial "show-up" identification was unduly suggestive. In making this claim, Harris argues that Acosta's pre-trial identification was unduly suggestive because Acosta, who was still present at the scene of the robbery approximately thirty minutes after the robbery occurred, saw two men exit a home near where he told police that he had seen the perpetrators flee. Acosta saw that the men were surrounded by police officers, some of whom had their weapons drawn, as the men exited the home with their hands in the air. After exiting the home, the men were taken to the ground and were put in handcuffs before being placed in the backseat of a police cruiser. Acosta subsequently identified these two men as the individuals who had robbed him. While we agree with Harris that these events, when viewed separate from the rest of the relevant circumstances, could arguably be considered unduly suggestive of guilt, upon review of the totality of the circumstances, we are convinced that Acosta's initial identification of Harris was reliable. *See Hubbell*, 754 N.E.2d at 892.

Acosta went to the scene of the robbery to deliver pizzas and cheesecakes. When Acosta arrived at the scene of the robbery, he spoke to and got a good look at the taller perpetrator. Moments later, the shorter perpetrator, who was wearing a black hooded sweatshirt, approached Acosta holding the gun "straight out" and pointed the gun in Acosta's

8

face. Tr. p. 81. During the robbery, the shorter perpetrator was in close proximity with Acosta. Acosta testified that after the shorter perpetrator pointed the gun in his face, Acosta focused on the perpetrator's eyes. Acosta continued to look into the shorter perpetrator's eyes until he was able to retreat to the point that the perpetrators moved past Acosta to Acosta's vehicle. The perpetrators rifled through Acosta's vehicle before fleeing. Acosta watched the perpetrators flee, eventually losing sight of the perpetrators when they walked between two houses. The perpetrators eventually emerged from one of these two houses.

Upon seeing the arrest of the two potential perpetrators, Acosta commented to his boss, who was standing next to him, that "look, they already got the two guys." Tr. p. 123. Acosta immediately identified the taller man as the taller perpetrator based on his height, look, and demeanor. However, despite making the above-stated comment to his boss, Acosta requested an opportunity to get closer to Harris before identifying him as the shorter perpetrator who had pointed the gun in his face. Acosta testified that he requested the opportunity to get a closer look at the shorter man before identifying him as the perpetrator because he did not want to make a false identification and "was afraid [he] was going to make a mistake so … [he] wanted to [be] a hundred percent sure that that was the man." Tr. p. 118. Acosta stated that both men had changed their clothing and that he wanted to look the shorter man in the eyes before identifying him as the perpetrator because he could not "forget the eyes." Tr. p. 117. Acosta further testified that after looking Harris in the eyes, he was "a hundred percent" sure that Harris was the man who had robbed him at gunpoint. Tr. p. 118.

Based on the totality of the circumstances, we conclude that the trial court did not err in finding Acosta's pre-trial identification of Harris as the individual who held him at gunpoint to be reliable. Acosta's identification of Harris was not immediate. Rather, Acosta requested permission to get closer to Harris to ensure that his identification of Harris was accurate. Acosta testified that he wanted to look Harris in the eyes before identifying him as the perpetrator because he had focused on the perpetrator's eyes during the robbery. After looking Harris in the eye, Acosta was "a hundred percent" sure that Harris was the man who had pointed the gun in his face. Tr. p. 118. The record demonstrates that facts independent of the potentially suggestive police procedure provided a basis for Acosta's identification of Harris as the perpetrator, and that the identification was not based on the potentially suggestive police procedure itself. As such, we conclude that the pre-trial "show-up" identification of Harris by Acosta was reliable and did not taint Acosta's subsequent in-court identification of Harris.

### B. Alleged Observation of Harris in Jail Attire

Having concluded that Acosta's pre-trial "show-up" identification of Harris was reliable and did not taint Acosta's subsequent in-trial identification of Harris, we must next consider Harris's claim that the trial court erred in admitting Acosta's in-court identification because Acosta allegedly observed Harris wearing jail attire in the courtroom prior to trial. In support of this claim, Harris relies on the Indiana Supreme Court's opinion in *Marsh v. State*, 480 N.E.2d 927 (Ind. 1985). In *Marsh*,

> The circumstances of the pretrial identification procedure of which Defendant complains are that two weeks after the instant robbery, Defendant and

Neumann robbed the restaurant again and were apprehended. The next day witness Springer accompanied police to the courtroom where Defendant and Neumann were being arraigned on the second robbery. Springer knew the names of the two suspects in this cause and when Defendant's name was called and Defendant appeared, Springer told police he was the same man he had seen in the restaurant during the first robbery.

480 N.E.2d at 928. "Under the circumstances of this confrontation, Springer knew the name of the man arrested in the second robbery of his restaurant and made his identification when Defendant was singled out and presented to him." *Id*. "The State [did] not disagree that this identification procedure at Defendant's arraignment was so suggestive that any identification resulting from it would be inadmissible." *Id*. The Supreme Court held that "Defendant's contention therefore is correct that Springer's identification testimony was inadmissible *unless* clear and convincing evidence proved that it was based on observations independent of the above confrontation." *Id*. (emphasis added).

However, in relying on *Marsh*, Harris fails to address the second part of the *Marsh* analysis which considers whether clear and convincing evidence proved that the identification was based on observations independent of the challenged interaction. The *Marsh* court held that reviewing courts "look to the totality of the circumstances to determine whether an independent basis for the identification existed." *Id*. (citing *Kusley v. State*, 432 N.E.2d 1337, 1338 (Ind. 1982)). Again,

[t]he factors to be considered are the length of the initial observation of the accused, the lighting conditions, the distance between the witness and the accused, the witness's capacity for observation, the witness's level of certainty, any discrepancy between the witness's initial description and the actual description and any identifications of another person. *Morgan v. State*, (1980) 272 Ind. 504, 400 N.E.2d 111; *Swope v. State*, (1975) 263 Ind. 148, 325 N.E.2d 193, *cert. denied*, 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100.

11

*Id*.

In considering the totality of the circumstances, the *Marsh* court held that the evidence most favorable to the State tended to show that although the witness saw Defendant for only a few seconds from thirty to forty feet away under fluorescent lights, the witness testified that "he was certain of his identification and that it was based only on his observation of Defendant in the restaurant." *Id*.

> The evidence showed that a few weeks before trial, Springer chose someone other than Defendant from a lineup. He changed his mind, however, and finally chose Defendant. He testified his confusion resulted from the fact that Defendant had grown a beard by the time of the lineup, whereas at the time of robbery he had only a mustache. Springer expected Defendant to have tried to change his appearance in some way, and Springer was confused and initially chose a clean-shaven, lineup member thinking Defendant might have shaved his mustache. He insisted, however, his identification of Defendant was accurate and that it was based on his observation of Defendant at the restaurant and at the time of the first robbery.

*Id*. The Supreme Court held that the evidence before the jury was sufficient to show independent recollection of witness Springer at the time of his testimony. *Id*. Finding no error, the Supreme Court affirmed the trial court's determination to allow the witness's identification of the defendant. *Id*.

Similar to *Marsh*, the record in the instant matter supports the determination that Acosta's identification was not based on the fact that he allegedly saw Harris in the court room in jail attire prior to the start of trial, but rather was based on independent circumstances. Upon being asked by police to identify two individuals that were apprehended near the scene of the robbery approximately thirty minutes after the robbery

occurred, Acosta immediately identified the taller perpetrator but requested permission to get a closer look at Harris to ensure that provided an accurate identification of the shorter perpetrator. Acosta testified that he wanted to look Harris in the eyes before identifying him as the perpetrator because he had focused on the perpetrator's eyes during the robbery. After looking Harris in the eyes, Acosta was "a hundred percent" sure that Harris was the man who had pointed the gun in his face. Tr. p. 118.

Upon considering the totality of the circumstances, we conclude that Acosta's identification of Harris was based on facts independent of the fact that Acosta allegedly saw Harris in jail attire in the court room prior to the beginning of trial. As such, we conclude that the alleged sight of Harris in jail attire prior to the beginning of trial did not taint Acosta's subsequent in-court identification of Harris. Having concluded that the trial court did not err in admitting Acosta's in-court identification of Harris as the individual who robbed him at gunpoint, we affirm Harris's conviction for Class B felony robbery.

The judgment of the trial court is affirmed.

NAJAM, J., and FRIEDLANDER, J., concur.