## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 26 2015, 9:18 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Marco Webster,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 26, 2015

Court of Appeals Case No.
49A02-1404-CR-253

Appeal from the Marion Superior Court.

The Honorable Mark D. Stoner, Judge.

Cause No. 49G06-1301-FB-6

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Marco L. Webster (Webster), appeals his conviction of four Counts of robbery while armed with a deadly weapon, Class B felonies, Ind. Code § 35-42-5-1 (2013); and one Count of robbery resulting in serious bodily injury, a Class A felony, I.C. § 35-42-5-1 (2013).

We affirm.

## ISSUES

Webster raises three issues on appeal, two of which we find dispositive and restate as follows:

(1) Whether the trial court abused its discretion in admitting evidence resulting from six show-up identifications; and

(2) Whether the State presented sufficient evidence to uphold Webster's conviction of robbery beyond a reasonable doubt.

## FACTS AND PROCEDURAL HISTORY

On New Year's Eve of 2012, around 12:30 p.m., construction worker Randall Crouch (Crouch) had completed a job on the northwest side of Indianapolis, Indiana, and was loading tools into his 2004 Ford Econoline work van. A black male wearing a brown coat, a hoodie, and a mask over his face approached Crouch, pointed a semi-automatic pistol at his face, and ordered him to unlock the van and start the ignition. Crouch complied, and after the robber had driven out of sight, he reported the carjacking to the Indianapolis

Metropolitan Police Department (IMPD), describing the van as half blue and half white, with ladders on the roof rack.

[5] Later that day, shortly before 3:00 p.m., a man armed with a semi-automatic handgun walked into the International Parts Store, located at 5360 N. Tacoma Avenue in Indianapolis, and yelled for everyone to get down on the floor. At that time, three employees were in the building: Todd Norris (Norris), Brian Smith (Smith), and Eric Thompson (Thompson). At the gunman's command, Smith removed the cash from the register, and all three gave him the cash from their wallets. After the gunman ran out of the store, Smith called 9-1-1 and reported that the store had been robbed at gunpoint by "a black male wearing a blue and white plaid jacket with a dark hoodie." (Transcript p. 197).

[6] Minutes later, a black male "wearing dark pants, . . . a bluish-black plaid jacket with a hoodie on, and with a scarf on his face[,]" entered the Harris Tire & Automotive Service, located across the street from the International Parts Store at 5425 N. Keystone Avenue. (Tr. p. 218). The man aimed a semi-automatic handgun at an employee, Danny Stumm (Stumm), and instructed him to empty the cash drawer. As Stumm was unlocking the register, the robber noticed a customer, Kenneth Rush (Rush), and demanded his wallet. When the perpetrator detected movement by another employee, Joshua Scholl (Scholl), he immediately turned and shot Scholl in the hip. Scholl retreated to the garage bays, where the company's owner, William Harris (Harris), was servicing a vehicle. Scholl, in the midst of calling 9-1-1, alerted Harris to the fact that he had been shot. Due to the noise of the compressor, Harris was unaware of the

ongoing robbery. When Harris opened the door to the showroom to investigate, the robber fired a second shot in Harris' direction. Although the bullet missed Harris, shrapnel hit him on the side of his face. The gunman exited the store, and Harris and Scholl observed through the window as he entered the driver-side door of a Ford service van, half white and half blue, with ladders on top. Harris noted that the license plate number was 1562534.

[7] Within minutes of the robberies, IMPD officers responded to both locations and commenced investigations. The witnesses were all separated for interviews, and Scholl was transported to the hospital. In general, they described the suspect as a black male in his twenties or thirties and of "average" or "medium" height and build. (Tr. pp. 160, 257). The witnesses also confirmed that the suspect was wearing a very distinctive blue and white plaid coat, dark pants, a dark hoodie that was pulled over his head, and a dark-colored scarf that left only his eyes exposed. Norris, Thompson, and Stumm described the scarf as having a camouflage pattern. In addition, while ordered to lie on the ground, Norris and Thompson observed that the suspect wore brand new tennis shoes that "were black and what I remember distinctly was the very clean white edges, around the bottom." (Tr. p. 259). Thompson identified the brand of shoes as "Jordans" and further noted that the suspect had facial hair "around his nose." (Tr. pp. 303-04).

[8] On that same afternoon, IMPD Officer Gary Toms (Officer Toms) was working an off-duty security job at Inverness Apartments, located on the northwest side of Indianapolis, about a fifteen-to-twenty-minute drive from the International

Parts Store and the Harris Tire & Automotive Service. At approximately 3:15 p.m., a blue and white Ford Econoline van pulled into the parking lot. When it passed by Officer Toms' squad car, he observed that the driver, later identified as Webster, was the sole occupant of the van. Immediately recognizing the van as the one described in the carjacking reported earlier that day, Officer Toms radioed for assistance. Officer Michael Roach (Officer Roach) was in the area and arrived moments later. They followed the van's route to the rear of the apartment complex and observed Webster walking on the sidewalk, wearing a dark-colored hoodie and carrying a "plaid flannel looking coat or jacket." (Tr. p. 361). When they instructed him to stop, Webster took off running.

[9] As the officers pursued him on foot, they saw Webster throw the coat and several other items down. Officer Roach apprehended Webster, placed him in handcuffs, and escorted him to his squad car. Retracing Webster's steps, the officers found a black nine-millimeter handgun and $682 in cash strewn throughout the snow, along with the blue and white plaid jacket. Inside the jacket pocket was a camouflage-patterned scarf and Rush's wallet. The van was registered to Crouch and had the license plate number 1562534.

[10] In the midst of his investigation at the International Parts Store, Detective Brent Hendricks (Detective Hendricks) received a report that Webster had been stopped with a van matching the one described by the Harris Tire & Automotive Service employees. Detective Hendricks told the witnesses that IMPD "had a person stopped that I wanted them to look at. . . . I specifically informed them that it may or may not be the person that robbed them but I did

want them to take a look." (Tr. p. 487). Between 4:00 p.m. and 5:15 p.m., Norris, Smith, Thompson, Harris, Stumm, and Rush were separately transported to Inverness Apartments in order to identify whether Webster was the robbery suspect.

[11] Because Webster had discarded the plaid coat when he fled, Officer Roach held the coat up near Webster for the first witness and subsequently draped it over Webster's shoulders for the rest. Each of the six witnesses unequivocally identified the jacket as being the same one worn by the robber. In addition to the jacket and hoodie, Harris immediately identified the van as the one used by the robber, and Rush noted that Webster's "build and everything seemed to be the same." (Tr. pp. 162-63). Norris also indicated that Webster's "shoes were the dead giveaway." (Tr. p. 265). Finally, Thompson stated that he "was a hundred percent positive that the clothes and the shoes were the same. And I could tell from the upper half of [Webster's] face that it was the same facial features as the guy who came and robbed us." (Tr. p. 303).

[12] On January 2, 2013, the State filed an Information charging Webster with Count I, carjacking, a Class B felony, I.C. § 35-42-5-2 (repealed 2014); Counts II through V, criminal confinement, Class B felonies, I.C. § 35-42-3-3(a),(b)(2)(A) (2013); Counts VI through IX and Count XI, robbery while armed with a deadly weapon, Class B felonies, I.C. § 35-42-5-1 (2013); Count X, battery, a Class C felony, I.C. § 35-42-2-1(a)(3) (2013); and Count XII, unlawful possession of a firearm by a serious violent felon, a Class B felony, I.C. § 35-47-4-5 (2013). On January 11, 2013, the State amended the

Information by adding Count XIII, robbery resulting in serious bodily injury, a Class A felony, I.C. § 35-42-5-1 (2013). On March 14, 2013, the State filed an Information alleging Webster to be a habitual offender. On December 9, 2013, Webster filed a motion to suppress the evidence of the show-up identifications. At the suppression hearing on January 10, 2014, Webster withdrew his motion.

[13] On February 24 and 25, 2014, the first phase of the bifurcated jury trial was conducted. Prior to the introduction of evidence, Webster reinstated his motion to suppress the evidence resulting from the show-up identifications. The trial court held a hearing outside of the jury's presence and granted the suppression motion to the extent that the witnesses were precluded from making in-court identifications of Webster. However, the trial court ruled that the witnesses would "be allowed to make identification[s] of the clothing but only if . . . there is a clear independent basis for being able to identify the clothing." (Tr. p. 103). At the close of the evidence, the jury returned a guilty verdict on Counts III through XI and Count XIII. Webster was found not guilty of Counts I and II. Following the verdict, Webster waived his right to a jury for the second phase of his trial concerning his charge as a serious violent felon (Count XII) and his habitual offender enhancement.

[14] On March 18, 2014, the trial court held a bench trial, at which time the State dismissed Count XII, and Webster stipulated to the habitual offender charge. The trial court adjudicated Webster to be a habitual offender and proceeded to the sentencing hearing. Based on double jeopardy considerations, the trial court merged Counts III, IV, and V into Counts VI, VII, and VIII, respectively,

and merged Counts IX and X into Count XIII.  A judgment of conviction was entered on Counts VI, VII, VIII, and XI, Class B felony robberies of Smith, Thompson, Norris, and Rush; and Count XIII, Class A felony robbery of Stumm resulting in serious bodily injury to Scholl.  The trial court imposed concurrent fifteen-year sentences on Counts VI, VII, and VIII; fifteen years on Count XI; and seventy years on Count XIII.  The trial court ordered the sentence on Count XIII to run concurrently with Count XI and consecutively to Counts VI, VII, and VIII, for an aggregate, executed term of eighty-five years.

[15]  Webster now appeals.  Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Admissibility of Identification Evidence*

[16]  Webster claims that the trial court abused its discretion in admitting evidence of the identifications because the one-on-one show-ups were "overly suggestive." (Appellant's Br. p. 14).  Decisions regarding the admission or exclusion of evidence are left to the trial court's sound discretion and are subject to review only for an abuse of that discretion.  *Hale v. State*, 976 N.E.2d 119, 123 (Ind. Ct. App. 2012).  Our court will find an abuse of discretion where "the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court."  *Id.*

[17]  The due process guaranteed by the Fourteenth Amendment to the United States Constitution requires the suppression of evidence if "the procedure used during a pretrial identification is impermissibly suggestive."  *Id.*  It is well established

that one-on-one show-up identifications are inherently suggestive. *Wethington v. State*, 560 N.E.2d 496, 501 (Ind. 1990). Nevertheless, evidence acquired from a show-up confrontation "is not subject to a *per se* rule of exclusion." *Mitchell v. State*, 690 N.E.2d 1200, 1203 (Ind. Ct. App. 1998), *reh'g denied*; *trans. denied*. Instead, "the admissibility of a show-up identification turns on an evaluation of the totality of the circumstances and whether they lead to the conclusion that the confrontation was conducted in a manner that could guide a witness into making a mistaken identification." *Hale*, 976 N.E.2d at 123-24.

[18] When reviewing the totality of the circumstances surrounding an identification, we consider:

> (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness's degree of attention while observing the offender; (3) the accuracy of the witness's prior description of the offender; (4) the level of certainty demonstrated by the witness at the identification; and (5) the length of time between the crime and the identification.

*Rasnick v. State*, 2 N.E.3d 17, 23 (Ind. Ct. App. 2013), *trans. denied*. Although inherently suspect, one-on-one confrontations have been found proper where they occurred "shortly after the commission of the crime 'because of the value of permitting a witness to view a suspect while the image of the perpetrator is fresh in the witness's mind.'" *Hubbell v. State*, 754 N.E.2d 884, 892 (Ind. 2001) (quoting *Head v. State*, 443 N.E.2d 44, 55 (Ind. 1982)).

[19] In the present case, Webster contends that the one-on-one show-ups were impermissibly suggestive because the police officers wrapped the plaid jacket

around him after he was detained. According to Webster, the witnesses based their identifications on the jacket, so an "[i]dentification . . . would not have been made but for police holding apparel up next to [him]." (Appellant's Br. p. 19). We disagree.[1]

[20] It is evident that the witnesses identified Webster at the show-ups based, in significant part, on the plaid jacket. *See Williams v. State*, 398 N.E.2d 674, 678 (Ind. Ct. App. 1979) ("The fact that the clerk based her identification on the clothes worn by the suspects rather than any distinguishing physical characteristics affects the credibility of her identification but not its admissibility."). However, at trial, each witness testified that the jacket that was displayed at the show-up was the same one worn by the robber, but—as the State posits—the witnesses did not positively identify Webster as the perpetrator of the robberies. Rather, to link the jacket to Webster, Officer Toms and Officer Roach testified that they observed the jacket in Webster's possession and that he threw it onto the ground when he tried to flee. Thus, we find that whether the police officers held the jacket up next to Webster, wrapped it around him, or left it laying in the snow is irrelevant because the witnesses recognized the jacket itself with a high degree of certainty.

---

[1] The State argues that Webster failed to properly preserve his claim that "the 'show-up' identification of the clothing was impermissible" because his motion to suppress "was aimed squarely at the witness[es'] ability to identify [Webster]—not the clothing." (State's Br. p. 8). Because arguments concerning the identification of Webster himself, the clothing in isolation, and the clothing on Webster's person were intermingled during the suppression hearing, we will address Webster's claim.

[21] Furthermore, looking to the totality of the circumstances, we cannot say that the show-ups were unduly suggestive. The evidence establishes that, prior to the show-ups, Norris, Smith, Thompson, Harris, Stumm, and Rush each provided consistent and accurate accounts of the suspect's clothing. *See Dishman v. State*, 525 N.E.2d 284, 285 (Ind. 1988). Additionally, the robberies occurred in broad daylight, and even though the robber wore a mask, the witnesses had ample opportunity to discern very specific details about the suspect, including that his mask had a camouflage pattern and that his gun was black and had a "square" front. (Tr. p. 293). Norris and Thompson had a clear view of the robber's feet when forced to lie on the ground, and they described both the brand and the style of his shoes.

[22] Within two hours of the robberies, each of the six witnesses identified Webster's jacket and hoodie as being the same worn by the perpetrator, and they confirmed that the camouflage scarf found in Webster's pocket was the same one used by the robber. *See Lyles v. State*, 834 N.E.2d 1035, 1045 (Ind. Ct. App. 2005) (noting that an identification occurring several hours after the crime may be permissible), *trans. denied*. Norris and Thompson identified Webster's shoes without hesitation, and—without any prompts from the officers—Harris noticed the van in the parking lot and confirmed that it was the same one used

in the robbery. *See Rasnick*, 2 N.E.3d at 24-25. Therefore, we find that the trial court did not abuse its discretion by admitting evidence from the show-ups.[2]

## II. *Sufficiency of the Evidence*

[23] Webster also claims that the State presented insufficient evidence to support his conviction. When reviewing a sufficiency claim, our standard of review is well settled. We do not reweigh evidence or assess witness credibility, and we will consider only the evidence and any reasonable inferences that support the verdict. *Gray v. State*, 903 N.E.2d 940, 943 (Ind. 2009). Our court will affirm the conviction so long as "there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.*

[24] In order to uphold Webster's conviction of robbery as a Class A felony, the State was required to prove that Webster knowingly or intentionally took property from Stumm by either using or threatening the use of force or by putting any person in fear, the commission of which resulted in serious bodily injury to Scholl. I.C. § 35-42-5-1 (2013). As for his conviction of four Counts of robbery as Class B felonies, the State had to establish that Webster, while armed with a deadly weapon, knowingly or intentionally took property from Norris, Smith, Thompson, and Rush by either using or threatening the use of force or by putting any person in fear. I.C. § 35-42-5-1 (2013). Webster does

---

[2] Webster next claims that his conviction of both Count X, battery as a Class C felony, and Count XIII, robbery as a Class A felony, violates his constitutional rights against double jeopardy. During the sentencing hearing, the trial court merged Count X into Count XIII in order to avoid double jeopardy implications, entering a judgment of conviction solely on Count XIII. Thus, we find no merit in Webster's argument.

not dispute that these crimes occurred; rather he argues that "[n]o witness could positively identify [him] as the robber. The only reference the witnesses had was to clothing Webster had in his possession when he was taken into custody." (Appellant's Br. p. 22). Again, we disagree.

[25] In addition to the descriptions provided by the witnesses, the armed robbery at the Harris Tire & Automotive Service was recorded by video surveillance. As such, the jury was able to clearly view that the perpetrator wore a blue and white plaid jacket, a dark-colored hoodie and dark pants, black shoes with white edges, and a camouflage-patterned scarf over his face. An exterior camera captured an image of the blue and white van, and Harris recorded the license plate number. Approximately fifteen minutes after the second robbery, Officer Toms observed Webster driving a blue and white van with the same license plate number.

[26] When Webster exited the van, he was wearing a dark hoodie and was carrying a blue and white plaid jacket, which he threw on the ground in the officers' presence. The officers discovered that the jacket had been concealing a nine-millimeter handgun, a camouflage-patterned scarf, Rush's wallet, and $682 in cash. During the trial, Harris testified that the standard practice at Harris Tire & Automotive Service for counting the cash drawer is to bundle the one-dollar bills in groups of twenty, securing each bundle with a staple and a post-it note. Among the cash that Webster had dropped during the foot chase, the officers found two bundles of twenty one-dollar bills that were secured with a staple and a post-it note. Moreover, the nine-millimeter gun found in Webster's

possession had a magazine with the capacity to hold fifteen bullets. When the evidence technician collected the gun, there were twelve bullets in the magazine and one in the chamber. Two nine-millimeter shell casings were found at the Harris Tire & Automotive Service.

[27] Webster further argues that the evidence was insufficient to establish his identity because the witnesses did not provide a precise height estimate of the perpetrator and because there were no fingerprints linking Webster to the robbery. While we first note that the surveillance footage clearly reveals that the robber wore gloves, thereby reducing the likelihood of leaving a fingerprint, we find that Webster's arguments amount to a request that we reweigh evidence, which we decline to do. Taken together, the evidence establishes beyond a reasonable doubt that it was Webster who perpetrated the robberies.

## CONCLUSION

[28] Based on the foregoing, we conclude that the trial court acted within its discretion in admitting evidence regarding the pre-trial identification of clothing. We further conclude that the State presented sufficient evidence to support Webster's conviction of one Count of Class A felony robbery and four Counts of Class B felony robbery beyond a reasonable doubt.

[29] Affirmed.

[30] Vaidik, C. J. and Baker, J. concur